Raymond Carl KINNAMON, Appellant,

v.

The STATE of Texas, Appellee.

No. 69531.

Court of Criminal Appeals of Texas, En Banc.

April 18, 1990.

Rehearing Denied June 27, 1990.

Stanley G. Schneider, T. Donald Moran, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Winston E. Cochran, Jr., Rusty Hardin, Bert Graham, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

PER CURIAM *.

The appellant, Raymond Carl Kinnamon, was tried and convicted of capital murder and his punishment assessed at death. He raises seventeen points of error. We affirm the judgment of the trial court.

On Monday evening, December 11, 1984, the appellant was one of several patrons

---

* This opinion was prepared by Judge M.P. "Rusty" Duncan prior to his death, and is hereby adopted as the opinion of the Court.

seated at the bar in N.J.'s Lounge in Houston. He had entered the bar several hours earlier, and, according to witnesses, sat alone, occasionally playing a video game mounted atop the bar. At one point he had a brief conversation with the bartender, Jeannie Marriott. After "last call" had been announced the appellant acted as if he was leaving with the other customers. Before exiting, he told Marriott that he had to use the restroom, turned and walked back across the lounge. When the appellant came out of the restroom a short time later, waitress Sharon Bryson, and a patron, Kenny Simmons, were seated at the bar and Marriott was cleaning up behind the counter. At that point, the appellant, possessing a firearm, ordered the employees and remaining patrons, including Ronald Longmire, the decedent, to put their hands on the bar and refrain from looking at him. He ordered Marriott to take the money out of the cash register and place it in a bag. Since no bag was available, she used Bryson's purse. After the appellant took the money, he ordered everyone to proceed single file to the men's restroom. Ronald Longmire, the decedent, was apparently at the end of the line, with the appellant following. As the people were proceeding to the restroom, the appellant asked them for their jewelry. As they were trying to remove their rings and watches, the appellant asked Longmire "what is that in your pocket?" to which the decedent responded "nothing, just my driver's license." A shot was fired, then a second almost immediately thereafter. The record indicates that the second shot entered the decedent's back from the left side at an angle. Longmire apparently fell to his knees. At this point, Sharon Bryson, the waitress, escaped through a rear exit, and in so doing activated a burglar alarm. The bartender, Jeannie Marriott, was pulled into the walk-in cooler by Kenny Simmons. About that time, a third shot was fired. Simmons later testified that while he and Marriott were in the cooler, someone attempted to enter from the outside by pulling on the door handle to the cooler. Meanwhile, Bryson fled to a nearby convenience store and telephoned the police.

Approximately ten minutes after the shooting, Marriott and Simmons came out of the cooler and saw Longmire wandering aimlessly through the bar, muttering incoherently and bleeding profusely from the gunshot wound. When the police arrived Marriott directed them to Longmire, who by that time was dazed and seated on the floor in a corner. Longmire was rushed to the hospital and died a short time later.

The appellant was identified in a photo array by the eyewitnesses to the offense. Some two weeks later he was apprehended at his Houston residence and placed under arrest.

In his first point of error, the appellant contends that the trial court erred in overruling appellant's objection to the definition of "intentional" in the court's charge during the guilt/innocence phase of the trial.

The definitional portion of the trial court's charge tracked verbatim the definition of "intentional" in V.T.C.A. Penal Code, § 6.03(a):

> A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

The appellant objected to the above charge, requesting instead that the definition read:

> A person acts intentionally or with intent with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to cause the result.

The appellant's requested charge differed from the charge of the trial court in a single respect: the appellant would have omitted the phrase "... to engage in the conduct ..."

Accordingly, the appellant complains only of the definitional portion of the court's charge. The definition complained of, however, must be examined in the context in which the defined term appears, and not limited to portions of a charge standing alone. *Selvage v. State*, 680 S.W.2d 17 (Tex.Cr.App.1984); *Inman v. State*, 650 S.W.2d 417 (Tex.Cr.App.1983). The term

"intentional," was explicated in the application portion of the court's charge as follows:

> Before you are warranted in convicting the defendant, Raymond Carl Kinnamon, of capital murder, you must find from the evidence beyond a reasonable doubt not only that on the occasion in question the defendant, Raymond Carl Kinnamon, was engaged in the commission or attempted commission of the felony offense of robbery, if any, of Ronald Charles Longmire, as defined in this charge, but also that during the commission of the robbery or attempted commission thereof, if any, the defendant, Raymond Carl Kinnamon, shot Ronald Charles Longmire with a gun with the *intention* of thereby causing his death. Unless you find from the evidence beyond a reasonable doubt that the defendant, Rayond Carl Kinnamon, on said occasion, specifically *intended* to cause the death of Ronald Charles Longmire when he shot him with a gun, if he did shoot him with a gun, you cannot convict him, of the offense of capital murder.
>
> Now if you find from the evidence beyond a reasonable doubt that on or about the 11th day of December, 1984, in Harris County, Texas, the defendant, Raymond Carl Kinnamon, did then and there unlawfully while in the course of committing or attempting to commit the robbery of Ronald Charles Longmire *intentionally* cause the death of Ronald Charles Longmire by shooting Ronald Charles Longmire with a gun, then you will find the defendant guilty of capital murder.[1]

Because the trial court refused to give to the jury his requested definition, the appellant contends that the jury was permitted to find that the appellant committed capital murder under § 19.03(a)(2), supra, if, quoting from appellant's brief, "[the jury] found either (1) a conscious objective to engage in a course of conduct such as pulling a trigger of a weapon, *or* (2) the desire to cause the result, the death of the complainant."

The appellant further complains that the charge as presented denied the appellant due process because it was not sufficiently clear what the jury must find to support a conviction for capital murder; i.e., the charge "sets two different standards for the culpable mental state—intentionally engaging in a course of action and intentionally causing the complainant's death ... one will support a conviction for capital murder while the other will not. Yet ... either could have resulted in a conviction for capital murder."

In support of his contention, the appellant relies upon *Alvarado v. State*, 704 S.W.2d 36 (Tex.Cr.App.1985). That case dealt in part with the V.T.C.A. Penal Code, § 6.03(a), definition of "intentional," supra, as applied to the injury to a child statute (V.T.C.A. Penal Code, § 22.04). In his final argument, the prosecutor in *Alvarado* stressed that a finding that the defendant had engaged in the conduct of putting the child in "hot water" knowingly or intentionally was sufficient to support a conviction, without mentioning the requirement that serious bodily injury must be the intended or "reasonably certain" result. On the defendant's motion for rehearing, this Court reversed his conviction because the charge allowed a conviction if the appellant had the requisite culpability as to either the result (injury to a child) or nature of the conduct alone (placing the child in "hot water"). *Id.*, at 37.

The *Alvarado* majority noted that the injury to a child statute, "like homicide and other assaultive [penal] prospections," hinges on the result of certain specified conduct. Despite the State's rather spurious claims to the contrary, it is clear that capital murder under § 19.03(a)(2), supra, like injury to a child under § 22.04, supra, is a "result of conduct" offense, e.g., the crime is defined in terms of one's objective to produce a specified result. In other words, not only must an accused be found to have intended to engage in the act that caused the death, he also must have specifically intended that death result from that

---

1. All emphasis is supplied unless indicated otherwise.

conduct. *Morrow v. State,* 753 S.W.2d 372 (Tex.Cr.App.1988). The mere intent to pull the trigger of a firearm will not satisfy the statute. *Id.*

■ Limiting the definitional portion of the charge, the application paragraphs of the charge restricted the definition of "intentional" to its factual context: that the appellant "intentionally caused the death of Ronald Charles Longmire by shooting Ronald Charles Longmire with a gun." Therefore, the appellant was convicted not because he "engage[d] in [the] conduct" of pulling the trigger of a gun, but because the jury found that his objective was to cause the death of the deceased in the course of robbery.

When read in conjunction with the application paragraph, the phrase "engage in conduct" in the abstract definition of "intentional" did not provide for any additional degree of culpability. Accordingly, in the context of this case, we hold that the disputed "engage in conduct" language which the trial court refused to exclude from the definitional portion of the jury charge was irrelevant with respect to the appellant's culpable mental state. Appellant's first point of error is overruled.

In his second and third points of error, the appellant complains of improper jury argument by the prosecutor at the guilt/innocence and punishment stages of the trial.

During the State's final argument at the guilt/innocence stage the prosecutor commented that the appellant killed Longmire because Longmire had recognized the appellant:

> And isn't it the inference that during this conversation the inference is Raymond Carl Kinnamon suddenly realized that he knew Ronnie Longmire and Ronnie Longmire suddenly realized that he knew Raymond Carl Kinnamon not only by sight but by name. And don't you think that it was important at that point to Raymond Carl Kinnamon to kill that witness who knew him by name and sight
> . . .

Appellant immediately objected to the argument as being outside the record. The trial court sustained the objection and in-structed the jury to "disregard the last comment" and to "base your verdict on the evidence." The court then overruled appellant's motion for mistrial.

■ Broadly speaking, there are four general areas of permissible jury argument: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; or (4) plea for law enforcement. *Todd v. State,* 598 S.W.2d 286 (Tex.Cr.App.1980); *Alejandro v. State,* 493 S.W.2d 230 (Tex. Cr.App.1973). Following an objectionable argument, an instruction by the court to disregard the comment will normally obviate the error, *Bell v. State,* 724 S.W.2d 780, 803 (Tex.Cr.App.1986) and cases cited therein, unless the remark is so inflammatory that its prejudicial effect cannot reasonably be removed by such an admonishment. *Melton v. State,* 713 S.W.2d 107, 114 (Tex.Cr.App.1986) (reversible error where prosecutor imputed that defendants were responsible for additional thefts not alleged in the indictment); *McKay v. State,* 707 S.W.2d 23, 37 (Tex.Cr.App.1985), *cert. denied* 479 U.S. 871, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986). Moreover, in order for an improper argument to rise to a level mandating reversal, the argument must be "extreme or manifestly improper, or inject new and harmful facts into evidence." *Id.,* at 36, citing *Kerns v. State,* 550 S.W.2d 91 (Tex.Cr.App.1977); *Thomas v. State,* 519 S.W.2d 430 (Tex.Cr.App.1975).

■ While there was some evidence that the appellant and the decedent frequented the same restaurant, there was no indication that the two were acquainted. Although the State's comment further strained an already tenuous connection between the evidence as presented and an appropriate summation or deduction from that evidence, *Alejandro v. State,* supra, *Melton v. State,* supra, at 114, it did not inject any new or harmful facts that were not cured by the court's instruction. Accordingly, we hold that the trial court's admonishment to the jury to disregard the prosecutor's comment was sufficient to cure error in this instance.

In a related point of error, the appellant complains of improper jury argument during the punishment phase. The evidence presented at trial indicated that three shots were fired in N.J.'s Lounge. Fragments of one bullet were found in the ceiling of the club and another bullet was recovered from Longmire's chest cavity, but the location of the third bullet could not be determined. In his closing argument, the prosecutor embellished on the evidence:

> Kinnamon thinks he is dead. So where does the focus of his attention shift? To Jeanie and Kenny Simmons. He sees them fleeing at that point in time into the cooler. A third shot is fired. Now, there is no testimony from any of the homicide detectives that they went into the cooler and examined there for a bullet hole. But doesn't that make sense that the third shot is fired at them as they are fleeing into the cooler?
>
> [Defense counsel]: Your Honor, that is so far outside the record it just shocks my conscience, and I object to it.
>
> The Court: Overruled. Members of the jury, you will base your verdict on the evidence as you heard it.

The trial court took the unusual and seemingly contradictory action of overruling appellant's objection but admonishing the jury. However, the refusal of the trial court to sustain the appellant's objection to the prosecutor's comment was not improper. Rhetorical questions, based upon a reasonable deduction from the evidence, are generally within the proper scope of jury argument. See generally, *Alejandro,* supra; *Todd v. State,* supra, at 296–297. The prosecutor qualified his comment as to where the third shot was fired by noting that the interior of the cooler was not examined for bullet holes. Accord-

ingly, the appellant's third point of error is overruled.

In his fourth point of error, the appellant contends that the trial court erred in allowing the scope of the cross-examination of the appellant's wife to exceed the scope of her direct examination.

This case was tried in 1985. At that time, Article 38.11, V.A.C.C.P., provided that the State was not permitted to call a defendant's spouse as a witness against a defendant except in limited circumstances.[2] Case law relative to Article 38.11, supra, and its statutory predecessors held that when one called a spouse to testify in his behalf, the State may cross-examine the spouse as to matters explored on direct examination, and also to "matters that are germane and pertinent to her direct testimony but which were not specifically brought out on direct." *Mitchell v. State,* 517 S.W.2d 282, 287 (Tex.Cr.App.1974); accord: *Firo v. State,* 657 S.W.2d 141, 142 (Tex.Cr.App.1983); *Peacock v. State,* 126 Tex.Crim. 602, 73 S.W.2d 105, 106 (1934) (spouse may be cross-examined about matters covered on direct and other matters designed to test the accuracy of spouse's testimony); *Blake v. State,* 193 S.W. 1064, 1065 (Tex.Cr.App.1917) (State may not develop new matter on spouse's cross-examination).

Myra Faye Valentine, appellant's common-law wife, was called as a witness to testify in his behalf. Misidentification was a key factor in appellant's defense. Witnesses for the State testified that the perpetrator did not have prominent facial hair, and they could not recall whether any of his fingers were amputated. Through a brief direct examination of Valentine, the appellant established that the accused was in the habit of wearing a mustache and was

---

**2.** Article 38.11 was repealed (Acts 1985, 69th Leg., ch. 685, sec. 9(b)) and replaced with Rule 504, Tex.R.Crim.Evid., effective September 1, 1986. In pertinent part, Article 38.11 provided: Neither husband nor wife shall, in any case, testify as to communications made by one to the other while married. Neither husband nor wife shall, in any case, after the marriage relation ceases, be made witnesses as to any communication made while the marriage re-

lation existed except in a case where one or the other is on trial for an offense and a declaration or communication made by the wife to the husband or by the husband to the wife goes to extenuate or justify the offense. The husband and wife may, in all criminal actions, be witnesses for each other, but except as hereafter provided, they shall in no case testify against each other in a criminal prosecution....

missing some fingers on one hand. The direct examination was confined to the subject of appellant's hands and facial features.

Specifically, the appellant complains that the State "wandered far and wide" from the direct examination, eliciting testimony about how the appellant wore his shirts, his personal grooming habits, details of the marriage, and the fact that appellant was in jail at the time of trial. Admittedly, the State's cross-examination was more extensive and touched the outer perimeters of the direct examination, but it did not deviate from the direct to any significant degree. It is apparent from the record that the portions of Valentine's testimony of which the appellant now complains were elicited inadvertently. For example, without prompting by the prosecution, Valentine volunteered that the appellant was in jail at the time of trial:

> Prosecutor: Did he ever have any period of time where [appellant's moustache] would get lighter or thinner?]
>
> Ms. Valentine: ... Well, I am sure, now that he has been locked up, he can't trim it and all that like, you know, they don't have mirrors in the county jail. They don't have anything to trim it with, do they?

Significantly, although the appellant alleges several instances of impermissible questioning under the former Article 38.11, supra, appellant objected only once during the course of the State's cross-examination of Valentine. Relative to that objection, witnesses for the State had testified that the perpetrator was wearing his shirt wrong side out at the time of the offense. The appellant's objection was sustained when the prosecutor asked Valentine if she had ever seen her husband wear his shirt inside out. The State ended its examination at that point.

Under Article 38.11, supra, only new incriminating evidence brought out against one spouse by the other constituted reversible error. *Stephens v. State*, 522 S.W.2d 924, 927 (Tex.Cr.App.1975). Given the fact that appellant's only objection in response to an impermissible cross-examination of the appellant's common-law wife was sustained, and considering the State's cross-examination of Valentine as a whole, we conclude that the questioning did not digress from the scope of the direct examination to a degree warranting reversal. Appellant's fourth point of error is, therefore, overruled.

In his fifth point of error, the appellant complains that the State did not provide access to certain physical evidence after it was ordered to do so by the court.

 Criminal defendants are entitled to limited discovery under Article 39.-14, supra, independent of the constitutional right of access to exculpatory evidence. Nevertheless, a defendant does not have a general right to discovery of evidence in possession of the State. *Whitchurch v. State*, 650 S.W.2d 422, 425 (Tex.Cr.App. 1983); *May v. State*, 738 S.W.2d 261, 274 (Tex.Cr.App.1987), *cert. denied* 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 158; *reh. denied* 484 U.S. 971, 108 S.Ct. 471, 98 L.Ed.2d 410. Decisions involving pretrial discovery of evidence which is not exculpatory, mitigating, or privileged are within the discretion of the trial court. *Quinones v. State*, 592 S.W.2d 933 (Tex.Cr.App.1980), *cert. denied* 449 U.S. 893, 101 S.Ct. 256, 66 L.Ed.2d 121; *Dickens v. Court of Appeals for the Second Supreme Judicial District of Texas*, 727 S.W.2d 542, 551 (Tex.Cr.App. 1987); *Whitchurch*, supra, at 425.

On May 22, 1985, the trial court granted certain discovery requests made by the appellant.[3] Article 39.14, supra, states that

---

**3.** The discovery requests granted by the court which the appellant alleges were not produced in a timely manner are as follows:

 * * * * * *

3. Any papers, objects, or real evidence in the possession of the police or the District Attorney's office or their employees or State agencies which may in any way be material to the guilt or innocence of this Defendant.

4. Any and all fingerprint impressions obtained by whatever means and process from the scene of the alleged offense in question, or the physical evidence found at the scene or found as a result of the investigation of this offense, whether such fingerprints were fin-

the order granting such discovery "shall specify the time, place and manner of making the inspection ..." Article 39.14, supra; *Terrell v. State*, 521 S.W.2d 618, 619 (Tex.Cr.App.1975) (statute requires trial court to set time and determine place for inspection and the manner in which it is conducted).

Nevertheless, the transcript herein does not indicate that any specific written order granting or specifying the "time, place and manner" was entered. However, notations of "granted" or "denied," presumably made by the trial court, appear alongside each numerical request in appellant's written motion.

The pretrial record reflects that at least some of the physical evidence requested by the appellant in his motion of May 22, 1985, was available for inspection on approximately July 1, 1985, the date the jury voir dire was commenced. On July 22, 1985, after the jury was selected and sworn but before various pretrial motions were addressed, the assistant district attorney produced in court some unspecified physical evidence and witness statements pursuant to the appellant's discovery request.

It is clear that the requested physical evidence was not placed into the laps of appellant's attorneys until some three weeks after the trial commenced. To be sure, the prosecution's response to appellant's request was dilatory. Waiting two months—from May 22, the date the requests were apparently granted, until July 22, the date the State began its case-in-chief—is not "timely." It is also clear, however, that defense counsel was aware that the evidence was available for inspection from the start of trial on July 1, 1985, yet failed to examine it until the "eleventh hour."

■ The issue is not whether the appellant was prejudiced by the trial court's

denial of certain discovery requests; indeed, the court ruled in appellant's favor on thirty-one out of a total of thirty-six requested items. Instead, the appellant's only complaint is that the trial court failed to schedule the requested discovery. However, it is apparent from the record that the trial court was never requested by the appellant to schedule a "time, place, and manner ...," Article 39.14, supra, to complete the discovery process. In fact, the appellant's written motion for discovery does not request such action, nor was there any oral request for such. Since it was not requested we find no error in the trial court's failure to make such an order. Therefore, appellant's fifth point of error is overruled.

In his sixth point of error, the appellant argues that it was error of constitutional magnitude to admit evidence of unadjudicated extraneous offenses in the sentencing phase of his trial. Relative to a capital offense, Article 37.071(a), V.A.C.C.P., permits the presentation of evidence during the punishment stage "as to any matter the court deems relevant to the sentence." *Id.* Allowing evidence of unadjudicated extraneous offenses in capital sentencing when the same is inadmissible with regard to other offenses, the appellant argues, denies him Fourteenth Amendment guarantees of equal protection and due process of law. He does not present any corresponding argument challenging the constitutionality of Article 37.071(a), supra, under the "due course of law" provision in Art. I, § 19, of the Texas Constitution.

Counsel for the appellant filed a written pretrial motion captioned "Motion to Challenge Constitutionality of 37.071 T.C.C.P." which was denied. At the punishment phase of the trial, the State introduced evidence of other robberies committed by appellant approximately one week after the robbery-murder at N.J.'s Lounge.

gerprints of the Defendant or were fingerprints from some other persons known or unknown.

\* \* \* \* \* \*

9. Any physical evidence found or seized at or near the scene of the alleged offense.
10. Any physical evidence seized at or near the scene of the Defendant's arrest.

11. Any physical evidence seized from the Defendant's person at the time of his arrest or while he has been held in custody.
12. Any physical evidence the State intends to offer as evidence at Defendant's trial.

The question before us has been answered by this Court on a multitude of occasions. Absent a showing of unfair surprise, evidence of unadjudicated extraneous offenses are admissible at the sentencing stage in a capital case. See, e.g., *Gentry v. State*, 770 S.W.2d 780 (Tex.Cr.App.1988); *Guerra v. State*, 771 S.W.2d 453, 461 (Tex. Cr.App.1988); *Allridge v. State*, 762 S.W.2d 146, 161 (Tex.Cr.App.1988); citing *Smith v. State*, 676 S.W.2d 379, 390 (Tex. Cr.App.1984); *Williams v. State* 622 S.W.2d 116, 120 (Tex.Cr.App.1981), *cert. denied* 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876; *Quinones v. State*, 592 S.W.2d 933 (Tex.Cr.App.1980), *cert. denied* 449 U.S. 893, 101 S.Ct. 256, 66 L.Ed.2d 121.

In *Williams*, supra, we held that such admissions do not render the proceedings fundamentally unfair or deprive an accused of due process and equal protection of law. Moreover, in the instant case, error is not precipitated by the introduction of extraneous offenses occurring after the charged offense. See, e.g., *Green v. State*, 587 S.W.2d 167 (Tex.Cr.App.1979) (evidence of similar murder occurring one month after the charged offense admissible during sentencing phrase). Accordingly, we overrule appellant's sixth point of error.

Appellant's seventh point of error also attacks the constitutionality of Article 37.-071, supra, alleging that it deprives the appellant of due process and due course of law and is violative of the Eighth Amendment of the United States Constitution and Article I of the Texas Constitution. Specifically, appellant complains that Article 37.-071 "fails to allow the jury to consider matters in mitigation of punishment that are not relevant to the special issues contained in article 37.071."

The record shows that evidence presented by the defense at the sentencing stage revolved around two themes: first, the purported inability of victims of a related offense committed by the appellant to identify him; and second, the likelihood that the decedent was intoxicated, and thereby provoked his own death by heroically attempting to thwart the robbery.

After the punishment evidence was presented, the appellant objected to the court's failure to charge mitigation due to intoxication pursuant to V.T.C.A. Penal Code, § 8.04.[4] That provision allows the introduction of evidence, relevant to temporary insanity, of a defendant's intoxication "in mitigation of the penalty attached to the offense for which he is being tried." Section 8.04(b), supra. While there was testimony to show that the decedent, Ronald Longmire, was intoxicated,[5] no such evidence was presented as to whether the appellant was intoxicated. As noted, evidence in mitigation of punishment due to intoxication under § 8.04, supra, is relevant only to an accused. The mental or physical impairment of the *decedent* with regard to a mitigating instruction under § 8.04, supra, is of no consequence. Moreover, the requested instruction on appellant's voluntary intoxication under § 8.04 as a circumstance in mitigation was not supported by the record. With that in mind, appellant's objection was properly overruled.

It is well known that Article 37.071, supra, allows for the introduction of evidence "as to any matter that the court deems relevant to the sentence." Article 37.-071(a), supra. Relative to that provision, *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 2333, 101 L.Ed.2d 155 (1988), which was pending before the United States Supreme Court at the time of this appeal, is illustrative. In *Franklin*, the petitioner argued that absent his requested jury instruction at sentencing relevant to

---

4. Section 8.04 provides:
 (a) Voluntary intoxication does not constitute a defense to the commission of a crime.
 (b) Evidence of temporary insanity caused by intoxication may be introduced by the actor in mitigation of the penalty attached to the offense for which he is being tried.
 (c) When temporary insanity is relied upon as a defense and the evidence tends to show that

such insanity was caused by intoxication, the court shall charge the jury in accordance with the provisions of this section.

5. At punishment, the defense recalled Dr. Robert Jordan, a medical examiner, who testified that the blood level alcohol of the decedent was 0.253, twice that defined as the threshold level of intoxication for driving an automobile.

mitigation, there was no opportunity for the jury to give "independent" mitigating weight (i.e., other than as it relates to the special issues) to his prison record. *Id.*, 108 S.Ct. at 2329. A plurality of the United States Supreme Court held that the sentencing court's refusal to instruct the jury that *any* mitigating evidence could be considered in answering the special issues did not deprive the jury of the opportunity to consider the petitioner's disciplinary record as mitigating evidence and thus did not violate the Eighth Amendment. *Id.* In *Franklin*, the only mitigating evidence introduced by the petitioner was that he had no record of disciplinary violations while in prison. While the jury was prevented from giving "independent" mitigating effect to the petitioner's disciplinary record, Justice O'Connor's concurring opinion noted:

> [t]hat limitation has no practical or constitutional significance in my view because the stipulation [as to the good prison record] had no relevance to any other aspect of petitioner's character. Nothing in *Lockett* [*v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ] or *Eddings* [*v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) ] requires that the sentencing authority be permitted to give effect to evidence beyond the extent to which it is relevant to the defendant's character or background or to the circumstances of the offense. *Lockett*, supra 438 U.S. at 604, n. 12 [98 S.Ct. at 2965, n. 12] ('Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the decedent's character, prior record, or the circumstances of his offense'); *Eddings*, supra, 455 U.S. at 114 [102 S.Ct. at 877 (holding that the sentencer must consider 'any *relevant* mitigating evidence'). [Emphasis as supplied in *Franklin*.]

*Id.*, 108 S.Ct. at 2333.

■ As was the case in *Franklin*, the appellant does not complain that he was denied the opportunity to present any mitigating evidence to the jury, or that the jury was instructed to ignore mitigating evidence. Cf. *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).

Instead, the nucleus of appellant's contention is that Article 37.071 is facially unconstitutional.

Even in light of *Penry v. Lynaugh*, —— U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), appellant's claim is without merit. In *Penry*, the United States Supreme Court found that evidence of a mitigating nature, i.e., Penry's mental retardation, organic brain disorder, and history of abuse as a child, had relevance beyond the parameters of the special issues contained in Article 37.071, supra. Consequently, consistent with her concurring opinion in *Franklin*, Justice O'Connor, writing for the Court, concluded that under the evidence the Texas capital murder scheme was applied to Penry in violation of the Eighth and Fourteenth Amendments because the court's charge to the jury did not permit a "discretionary grant of mercy based upon the existence of mitigating circumstances." *Id.*, 108 S.Ct. at 2951. In the present case, unlike *Penry*, the appellant did not tender any evidence in mitigation outside the scope of the special issues, nor does he direct us to any mitigating evidence which was excluded. At no point did the defense attempt to introduce evidence of Kinnamon's background, his character, or whether he had emotional or mental problems. The only mitigating evidence introduced by the appellant was the suggestion that the decedent was intoxicated and somehow in the course of a scuffle provoked his own death. It follows that since there was no mitigating evidence offered, there is no error.

The failure to charge the jury on how it may utilize mitigating evidence when there is no evidence relevant to the issue constitutes a hollow contention on which to predicate error of constitutional magnitude. Vicarious constitutional arguments, without support in the record, are not properly before this Court on appeal. Accordingly, appellant's seventh point of error is overruled.

■ In his eighth point of error, the appellant contends that the evidence was insufficient for the jury to answer affirma-

tively the first special issue, i.e., whether the conduct of the appellant that caused the death of the deceased "was committed deliberately and with the reasonable expectation that the death of the deceased or another would result." Article 37.071(b)(1), supra.

The appellant argues that his act of shooting the deceased was not done deliberately, but rather was the "product of a drunken individual (the decedent) suddenly turning on an armed robber without warning." In support of this contention, the appellant directs us to the following stipulation:

That if Sgt. S.J. Garza, Houston Police Department Homicide Division, were called to testify in this case now on trial, he would state that on December 12, 1984, he interviewed a witness by the name of Mr. Dan Flynn concerning the murder of Ronald Charles Longmire which occurred on December 11, 1984 at N.J.'s Club located at 3815 Mangum and that Mr. Flynn related the following:

'... That he could tell that Longmire had a lot to drink that night before he left and stated that when he is in this condition, it would be possible for him to think that he could overtake a hijacker's pistol.

Flynn stated that if Longmire was sober he would not resist being robbed and would not attempt to jump him.'

In its brief, the State counters the stipulation by directing us to testimony of bartender Jeannie Marriott, who was also acquainted with the decedent, to show that he did not provoke his own death:

State: Was Ronnie fighting with him at that time?

Marriott: No. Ronnie was walking and then fell.

State: Was Ronnie moving at that time?

Marriott: I thought they were all moving.

State: Was Ronnie the kind of guy who would have fought with this man?

Marriott: No. No.

While testimony by the medical examiner establishes that the decedent's blood alcohol level was quite high, the evidence as to whether a scuffle occurred between the appellant and Longmire was contradictory. In a statement to the authorities on the night of the incident, Marriott stated that she heard, but did not see, the shots as they were fired: "They sounded like they were shot in a sequence of one shot, then a short space, then two three. I turned around after the third shot. I didn't see Sharon or [Longmire]."

Once on the witness stand, however, Ms. Marriott testified that the above statement was inaccurate:

State: That is your statement, no question about that?

Marriott: Yes.

State: Is that the way you remember it?

Marriott: No.

State: All Right. Would you explain for the jury in your own words now, as you start back there, you started to walk the same area that statement covers. What is it that you remember your best memory is?

Marriott: Well, I apparently had to have turned around to see the flashes or I wouldn't have seen them.

State: Are you sure you saw flashes?

Marriott: I am sure I did.

State: How many flashes:

Marriott: It was just a flash.

State: How many flashes did you see?

Marriott: Two.

Given the above discrepant statements by Marriott, the evidence is ambiguous as to whether Marriott merely heard, or actually saw, the fatal shot being fired. Likewise, the stipulation that the decedent would risk overtaking a robber conflicts with Marriott's testimony that Longmire would not take such a risk.

We recently noted that an affirmative finding on the first special issue that the conduct of the defendant was "deliberate" requires evidence that the defendant's conduct alone constituted a conscious decision, greater than mere will, to cause the victim's death. *Nichols v. State*, 754 S.W.2d 185 (Tex.Cr.App.1988). Accordingly, a jury must find "a moment of deliberation and

the determination on the part of the actor to kill" before it is justified in answering "yes" to special issue number one. This determination may be found by the totality of the circumstances in each case. *Cannon v. State*, 691 S.W.2d 664, 677 (Tex.Cr. App.1985), *cert. denied* 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931. Deliberate conduct, however, need not be the result of a premeditated act. *Cannon*, supra, at 677; *Granviel v. State*, 552 S.W.2d 107, 123 (Tex.Cr.App.1976); *Fearance v. State*, 620 S.W.2d 577, 584, n. 6 (Tex.Cr.App.1981), *cert. denied* 454 U.S. 899, 102 S.Ct. 400, 70 L.Ed.2d 215.

Utilizing the now familiar standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt, we hold that the evidence was sufficient to support an affirmative response to the first special issue. Accordingly, appellant's eighth point of error is overruled.

■■■ In his ninth point of error, the appellant argues that the trial court committed fundamental error by failing to include a lesser included offense of murder in the charge at the guilt/innocence stage of the trial. The record reflects that the appellant never requested that the jury be charged on the lesser included offense of murder. Even where a lesser included offense is supported by the evidence, the failure of defense counsel to request a charge on the offense or properly object to its omission constitutes a waiver. *Moreno v. State*, 702 S.W.2d 636 (Tex.Cr.App.1986) (if evidence from any source raises issue and jury charge on issue is properly requested, issue must be submitted to jury); *Hunter v. State*, 647 S.W.2d 657 (Tex.Cr. App.1983) (where evidence raises lesser included offense and indicates that defendant if guilty, is guilty only of lesser included offense, charge on lesser included offense must be submitted assuming charge is properly requested or its omission properly objected to). In the absence of such a

request, or objection, the error complained of is waived. Appellant's ninth point of error is overruled.

Perhaps anticipating our response to appellant's ninth point of error, appellant contends in his tenth point of error that his trial counsel was ineffective for failing to request a charge on the lesser included offense of murder. Appellant contends that the evidence supported the inclusion of a charge on murder, and asks this court to "hold that, at least in capital cases, trial defense counsel have a duty to seek jury charges on lesser included offenses if the evidence raises the lesser included offense."

■■■ For a defendant to be entitled to a charge on a lesser included offense, the lesser included offense must be included within the proof necessary to establish the offense charged. Additionally, there must be some evidence in the record that if the defendant is guilty, he is guilty only of the lesser offense. *Aguilar v. State*, 682 S.W.2d 556 (Tex.Cr.App.1985); *Royster v. State*, 622 S.W.2d 442 (Tex.Cr.App.1981). However, the fact that the State necessarily must prove the lesser offense of murder in order to establish the elements of capital murder does not automatically entitle the defendant to a charge on the lesser offense. *Aguilar*, supra.

In *Johnson v. State*, 691 S.W.2d 619 (Tex.Cr.App.1984), defense counsel failed to request a jury charge on the issue of the voluntariness of the defendant's confession. On appeal we held that counsel was not ineffective for failing to request such a jury charge because no evidence was presented raising the issue. Appellant concedes that it is not ineffectiveness to fail to request a jury charge to which the defendant is not entitled; however, he argues that the instant case presented the opposite situation: trial counsel failed to request a charge to which the appellant herein *was* entitled, because the issue of murder was raised by the evidence.

In order for the appellant to prevail on this point, the evidence must show that the appellant was guilty only of murder under V.T.C.A. Penal Code, § 19.02(a)(2), not mur-

der in the course of committing a robbery. The evidence presented makes it clear that the appellant asked the surviving witnesses to turn over their valuables. Marriott testified that the appellant ordered the decedent and another patron to put their money on the bar. As they were being marched toward the restroom, the appellant asked Longmire "What is that in your pocket?" to which Longmire responded "It's just my driver's license." It is obvious that the jury chose to interpret the evidence as showing that the appellant asked Longmire what was in his pocket because he believed Longmire had something of value that he refused to turn over at gunpoint.

We have previously held that when ineffective assistance of counsel is alleged at the guilt/innocence stage, the appropriate standard is derived from *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by this court in *Hernandez v. State,* 726 S.W.2d 53, 55 (Tex.Cr.App.1986):

1. [The defendant] must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance ... [T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.,* 104 S.Ct. at 2064–66.

2. [T]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.,* 104 S.Ct. at S.Ct. 2068.

*Id.,* at 55.

In our view, given the presumption that counsel is presumed to "have made all significant decisions in the light of reasonable professional judgment," and in light of the evidence presented that the appellant committed murder in the course of a robbery, we hold that counsel's failure to request a charge on the lesser included offense of murder was not ineffective assistance of counsel. Since the evidence did not authorize the submission of a murder instruction as a lesser included offense appellant's trial counsel was not ineffective for failing to request it. Accordingly, the appellant's tenth point of error is overruled.

In point of error number eleven, the appellant alleges that the trial judge deprived him of effective assistance of counsel by the judge's refusal to testify at the hearing on the motion for new trial regarding a conversation the judge had with a juror about the case before the jury was discharged.

While the appellant acknowledges that it is improper to call a judge as a witness at trial, Rule 605, Tex.R.Crim.Evid., he does claim that it is permissible to a call a judge to testify at a post-trial proceeding such as a motion for new trial, since the judge was a witness to possible jury misconduct and prejudice.

The facts pertinent to this point of error are as follows: the appellant discovered that during a break in the punishment phase of the trial one of the jurors apparently questioned the judge concerning whether the appellant had access to the detailed, juror information sheets, indicating her fear of potential retribution by the appellant. The appellant requested that the court conduct a hearing to determine whether or not these concerns had been subject to some discussion among the jurors, thereby calling their impartiality into question. Over the course of a lengthy discussion on the subject with the court, Hansen, one of appellant's attorneys, acknowledged that he had been seated next to the appellant throughout the trial and had never observed the appellant examining any of the juror information sheets. Even so, the appellant's attorney insisted that the issue is not whether the appellant actually examined the sheets but whether the jurors were infected with bias and prejudice borne out of fear of retribution so that they could not render an impartial

verdict. Appellant's request for a hearing on that issue was denied.

At the hearing on the motion for new trial, the juror testified that she had some concerns about the disposition of the jury information forms and whether the appellant had access to them:

Q: You thought that you saw the defendant looking through the information sheets?
A: Yes, I did.
Q: Did you convey that thought to other members of the jury?
A: No.

\* \* \* \* \* \*

Q: Why did it concern you?
A: Because I felt that this was a breach of professional confidence.
Q: Whose confidence?
A: The attorneys.

\* \* \* \* \* \*

Q: Did the breach of the professional duty that you perceived during the punishment phase of the trial affect the way you judged the questions that were asked and the conduct of the attorneys?
A: Absolutely not.

At the time the juror made her inquiry of the judge,[6] the jury had already returned a guilty verdict and the appellant was awaiting the assessment of punishment. The juror specifically stated that her deliberations were not affected by the appellant's possible access to the jury sheets. She further stated that he did not mention her concerns to the other jurors until after the jurors voted to impose the death penalty against the appellant.

In the instant case, the appellant argues that the trial court deprived the appellant of his right to effective assistance of counsel in that the trial court "kept from the record" important facts relating to possible bias on the part of a seated juror. According to appellant, there were two parties to the conversation: the juror and the judge.

The appellant categorizes the testimony of the former as "evasive and unclear," while the latter "chose not to testify."

Although appellant raises this issue in the context of effective assistance of counsel, his allegation that counsel was prevented from being effective by the failure of the trial judge to testify as to "important facts" which he discussed with the juror is without merit. Although appellate counsel requested the trial judge's testimony at the motion for new trial, we find that there was no abuse of discretion in his refusal to testify. Juror Edwana Corley made it clear that her contact with the court was initiated because of her concerns that appellant had access to the jury information sheets, and that this could have been a breach of professional confidence. The record is also clear that this contact in no way affected her deliberations and that no mention of this fear was mentioned to the other jurors until after jurors voted on the special issues at the punishment stage. Under these circumstances, appellant was able to elicit from the juror the context of her contact with Judge Poe, and how her concerns had no effect on her deliberations nor in any other way affected her in discharging her duties as a juror. Based upon the juror's testimony, Judge Poe as trier of fact, overruled the motion for new trial. His ruling is supported by the record. Appellant's eleventh point of error is overruled.

In points of error twelve and thirteen, the appellant contends that the trial court erred in granting the State's challenge for cause to venirepersons Charlie Skinner and Philip Owen Beane, both of whom were qualified for jury service under the standards announced in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).[7]

---

6. Whether the trial judge participated in a conversation with the juror is not evident from the record. It should be obvious that such should never *occur*. *See* Article 36.27, V.A.C.C.P.

7. We note at the outset that neither the State nor the appellant exhausted their peremptory challenges; at the close of voir dire, the State had five challenges remaining; the appellant had two.

*Adams,* supra, set forth the proper standard for excluding jurors based on their opposition to the death penalty. *Adams* was reaffirmed five years later in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985): [8]

> [A] juror may not be challenged for cause based on his views about capital punishment unless those views would substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will conscientiously apply the law as charged by the court.

*Adams,* supra, at 45, 100 S.Ct. at 2526.

That standard must be read in conjunction with Article 35.16, V.A.C.C.P., "Reasons for challenge for cause" which provides in part:

> (b) A challenge for cause may be made by the State for any of the following reasons:
>
> 1. That the juror has conscientious scruples in regard to the infliction of the punishment of death for crime, in a capital case, where the State is seeking the death penalty;
>
> * * * * * *
>
> 3. That he has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment.

Venireperson Skinner acknowledged that he had no conscientious, moral, or religious scruples against the death penalty. He stated that he was not always against capital punishment, but explained "the holder I got the more I looked at crime as opposed to punishment ... Age, maturity, because I don't look at it as being so much a deterrent to crime." Interestingly, Skinner took the unusual position that death is not the ultimate punishment: "Now, when you talk about punishment, killing a man, to me, is not punishment. You only punish him up until the time you kill him, and then, therefore, after you kill him, his human suffering, you know, is over ..."

Without quoting at length from the record, Skinner indicated that he would "have to" answer the punishment issues according to the evidence. He then acknowledged that even though the State may have proven their case beyond a reasonable doubt, that the defendant is guilty, and that the answers should be "yes," he could never actually vote "yes" irrespective of what the facts were.

Frustrated with Skinner's inconsistent responses to counsels' questions, the court, utilizing an arguably appropriate metaphor, told Skinner, a postman, that he wanted him "to put the mail in the mail box and I want it to stay there." The judge then posited the final series of voir dire questions to Skinner before excusing him for cause:

> Q: [T]he question is: Would you follow the law and answer those questions yes if you believed it beyond a reasonable

---

**8.** We note that the stricter standard under *Witherspoon,* supra, for determining whether a challenge for cause by the State has been improperly granted was rejected in favor of the standard articulated in *Adams* and *Witt,* supra. *Witt* dispensed with *Witherspoon's* "automatic decision-making" and the requirement that juror's bias be demonstrated with "unmistakable clarity." *Witt,* supra, at 424, 105 S.Ct. at 852. See also *Briddle v. State,* 742 S.W.2d 379, 384 (Tex.Cr. App.1987).

Appellant argues that this Court is not bound by the *Witt* standard because that case involved a federal habeas corpus proceeding filed pursuant to 28 U.S.C.A. § 2254(d), which requires federal courts considering habeas corpus petitions to accept the State court findings of fact if they are fairly supported by the record. Since this case is before the Court on direct appeal, he contends, no such statute applies.

On the contrary, while we are not bound by § 2254(d), supra, *Witt* clarified the doctrine set forth in *Witherspoon* and *Adams,* neither of which was a federal habeas corpus case. Nothing in *Witt* suggests that the standard therein was designed to be limited to peculiar federal procedural grounds. Moreover, relative to the Supreme Court's statement in *Witt* that "deference must be paid to the trial judge who hears and sees the juror" *id.,* at 425–26, 105 S.Ct. at 852–53, Texas cases predating *Witt* noted deference to the trial court's rulings on prospective jurors. See, e.g., *Briddle,* supra, citing *Tezeno v. State,* 484 S.W.2d 374 (Tex.Cr.App.1972); *Villareal v. State,* 576 S.W.2d 51 (Tex.Cr.App.1978); Cf. Judge Clinton's dissenting opinion in *Briddle,* supra, at 392 and concurrence in *Clark v. State,* 717 S.W.2d 910, 920 (Tex.Cr.App.1986).

doubt, or would you say I am against the death penalty, I don't care what you say, I am going to say no?

A: That is what I would do.

Q: You would say no or you would say yes?

A: I would say no.

Q: Have you put the mail in the slot? Is that where it's going to stay?

A: That is where it's going to stay.

Q: Do you understand my question?

A: Yes, I understand your question.

Q: That is your final answer?

A: That is my final answer.

Q: We could be here until midnight passing you back and forth to all these lawyers and back to me. And I want to know what the final answer is going to be, Mr. Skinner.

A: I would vote no.

The judge then granted the State's challenge for cause "based on the totality of [Skinner's] answers."

Venireman Beane expressed personal opposition to the death penalty, basing his decision on religious and moral reasons. He was rehabilitated by defense counsel to a degree when he stated he "would answer these questions yes if they were proven to [Beane] the answer should be yes beyond a reasonable doubt." Nevertheless, Beane later explained that "I guess it would be better to lie than to have someone die," and that it would be "more important than lying about a law you disagree with in the first place" to prevent the imposition of the death penalty. Beane, in a final attempt to clarify his position, revealed "What I am saying is that I can't lie and I can't give anyone the death penalty either ... [M]y religious beliefs say that I should obey civil law and be governed by the state or the country, but my religious beliefs also say we cannot take another life." With that the trial court sustained the State's challenge for cause.

Recognizing the advantage of face-to-face observations of the venire during voir dire, we accord deference to the trial judge's determinations in gauging sincerity and demeanor. *Witt,* supra, at 425–26, 105

S.Ct. at 852–53; *Wilkerson v. State,* 726 S.W.2d 542, 545 (Tex.Cr.App.1986); *Bird v. State,* 692 S.W.2d 65, 75 (Tex.Cr.App.1985).

Examining venireperson Skinner's answers as a whole we are persuaded that Skinner would have been unable to resolve the issues put to him at the punishment phase and consequently would have been unable to follow his oath as a juror. Accordingly, granting the State's challenge for cause under these circumstances was not error.

As to venireperson Beane, we hold that he was properly removed for cause since he acknowledged that he could not resolve his religious conflicts with respect to the death penalty and as a consequence his performance as a juror would be substantially impaired. Accord *Knox v. State,* 744 S.W.2d 53 (Tex.Cr.App.1987), *cert. denied* 486 U.S. 1061, 108 S.Ct. 2834, 100 L.Ed.2d 934, reh. den. 487 U.S. 1246, 109 S.Ct. 4, 101 L.Ed.2d 956.

Appellant's twelfth and thirteenth points of error are overruled.

In points of error fourteen and fifteen, the appellant contends that the trial court erred in sustaining the State's objection to portions of the autopsy report and in so doing deprived appellant his right to confrontation under the Sixth and Fourteenth Amendments of the United States Constitution and Article I, § 10 of the Texas Constitution.

Portions of State's Exhibit Number 72, the autopsy report, were introduced into evidence through Dr. Robert Jordan, Assistant Medical Examiner for Harris County and a signatory on the autopsy report. Appellant made no objection to its introduction.

On cross-examination Dr. Jordan conceded that a page had been removed from the autopsy report by the prosecutor in open court prior to the admission of State's Exhibit 72. Dr. Jordan further testified that the removed page "represents the investigator's report at the scene" and as such "becomes an intrinsic part of the autopsy report" and was used to "base part of [the] physical observations of the body

in determining the cause of death." The defense immediately offered the omitted page into evidence as Defense Exhibit No. 1.[9]

The State then took Dr. Jordan on voir dire and established that the page contained observations made by investigator J. Peyton based on conversations with third parties. The State objected to the admission of the page, contending that the disputed portion constituted "hearsay on hearsay." After examining the disputed page, the court sustained the State's objection "as to all statements made other than the statements made by the investigator."

The defense then attempted to reoffer the page of the report in its entirety "under the rule of optional completeness and also by the fact that [the prosecutor] has used it before the jury and read portions of it, we would offer it to be complete before the jury." The court responded: "Same ruling. The Court will allow those portions that do not reflect hearsay statements made to the investigator. I will sustain it

as to hearsay statements made to the investigator."

The rule of optional completeness, at the time of appellant's trial, was expressed under former Article 38.24, V.A.C.C.P.:[10]

The purpose of Article 38.24, supra, was noted in *Evans v. State*, 643 S.W.2d 157 (Tex.Cr.App.1982), as "to reduce the possibility of the fact finder receiving a false impression from hearing the evidence of only part of an act." *Id.*, at 161, citing *Roman v. State*, 503 S.W.2d 252 (Tex.Cr. App.1974).

The comment to Tex.R.Crim.Evid. Rule 106, one of the successors to Article 38.24, supra, refers to "the common law doctrine that the rule of optional completeness ... *may* take precedence over exclusionary doctrines such as the hearsay ... rule.... [emphasis supplied]" Nevertheless, Article 38.24, supra, does not compel the conclusion that hearsay be admitted in all situations. The compound hearsay in this instance originated with statements made by witnesses to the offense to a homicide investigator who in turn relayed the state-

---

9. After stating preliminaries such as the decedent's name and address, the "information" section of Defense Exhibit 1 contained the following:

> According to Ms. Trate, the decedent arrived at the hospital at 2:35 a.m. on December 11, 1984 via City of Houston Fire Department Ambulance, Unit #50, from 4800 Mangum Road, and was pronounced dead at 3:10 a.m., on December 11, 1984, by Dr. Clyde Jones, with an admitting diagnosis of gunshot wound to the chest. According to the Houston Police Department, Homicide Division, Sergeant Daley, the decedent was shot in the chest at approximately 1:25 a.m., on December 11, 1984, by an unknown white male with an unknown type and caliber pistol during an attempted armed robbery of the N.J. Club, 3815 Mangum Road, Houston, Texas. The decedent was the owner of the N.J. Club, however, was thought to be just at the club having a drink at the time of the shooting. According to witnesses in the club, the decedent apparently struggled briefly with the armed suspect after the suspect had taken money from a customer and the bar's cash register at gunpoint. The suspect and the weapon were not recovered.

10. Repealed by Texas Rules of Criminal Evidence effective September 1, 1986 (Acts 1985, 69th Leg., ch. 685, § 9(b)).

The successor to Article 38.24 is Tex.R.Crim. Evid. Rule 106 and 107. Rule 106, "Remainder of Related Writings or Recorded Statements" provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may at that time introduce any part or other writing or recorded statement which ought in fairness be considered contemporaneously with it. "Writing or recorded statement" includes depositions.

Rule 107, "Rule of Optional Completeness" provides:

> When part of act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other, as when a letter is read, all letters on the same subject between the same parties may be given. When a detailed act, declaration, conversation, writing or recorded statement is given in evidence, any other act, declaration, writing or recorded statement which is necessary to make it fully understood or to explain the same may also be given in evidence. "Writing or recorded statement" includes depositions.
>
> When part of an act, declaration, or conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other, as when a letter is read, all letters on the same subject between the same parties may be given.

ments to investigator J. Peyton, author or the disputed page. The page was supplied to Dr. Jordan who apparently used the information contained therein to assist him in the autopsy of the deceased.

It is important to note that the court did not exclude the disputed page in its entirety. Those portions of the investigator's report relating to observations of the decedent's body were not excluded. Further, Dr. Jordan acknowledged that the investigator's report was used in making "physical observations" to assist him in determining the cause of death. The hearsay statements in the report did not relate to such "physical observations."

The excluded hearsay statements were made by "witnesses in the club" to the homicide investigator. Significantly, all witnesses to the offense had an opportunity to be questioned and cross-examined at length during the course of appellant's trial. Moreover, if the appellant wanted the hearsay portions of the investigator's page to be introduced into evidence, the appellant could have subpoenaed the investigator himself as a sponsoring witness to testify as to his comments. Accordingly, we perceive no violation of appellant's constitutional right to confrontation and cross-examination under the United States or Texas Constitutions.

Appellant's fourteenth and fifteenth points of error are overruled.

Point of error sixteen[11] asserts that the appellant was deprived of due process of law and due course of law under the Fourteenth Amendment to the United States Constitution and Article I, § 10 of the Texas Constitution by the State's use of an improper hypothetical during voir dire. Appellant's final point of error[12] contends that the trial court erred in overruling appellant's objections to the State's use of an improper definition of "intentional" during voir dire.

Through the use by the State of certain hypothetical situations utilized apparently to explain to the venireperson the difference between "intentional" and "deliberate" during voir dire, the appellant complains that the State was permitted "to improperly 'instruct' the venire as to the law of capital murder to the detriment of appellant."

In *Lane v. State*, 743 S.W.2d 617 (Tex. Cr.App.1987), error was predicated on the use of an improper hypothetical by the prosecution to distinguish to the venire the prosecutor's opinion regarding the difference between intentional and deliberate conduct. The *Lane* hypothetical involved a shot fired into the ceiling, followed by a fatal ricochet. In *Gardner v. State*, 730 S.W.2d 675 (Tex.Cr.App.1987), a capital case, the prosecution attempted to illustrate what would amount to an intentional killing would not necessarily constitute a killing perpetrated "deliberately and with the reasonable expectation that ... death ... would result." The prosecutor posited a scenario whereby a robbery victim shot in the leg and that injury ultimately leading to the victim's death amounted to an "intentional" killing. The hypothetical, however, failed to show facts which would amount to capital murder, i.e., that the actor intentionally caused the death of the deceased. *Id.*, at 687. Nevertheless, the defendant was granted two additional peremptory challenges without citing that any challenge for cause on his part had been erroneously denied or any specific peremptory challenge he had been forced to use due to premature termination of questioning. "Under these circumstances," we said, "any harm rendered by the appellant by having to exercise a peremptory challenge was nullified." *Id.*, at 690.

*Lane* is distinguishable from *Gardner*, supra, in that when defense counsel's peremptory challenges were exhausted and his request for additional challenges denied, he cited the names of specific jurors upon which he was forced to exercise peremptory challenges. Consequently, when a juror unacceptable to the appellant was seated, "the error was preserved, and the harm was not cured." *Id.*, at 629.

Similarly, in *Morrow v. State*, 753 S.W.2d 372 (Tex.Cr.App.1988), we reversed appel-

---

11. Point of error sixteen was mistakenly numbered "fifteen" in appellant's brief.

12. Point of error seventeen was mistakenly designated "sixteen" in appellant's brief.

lant's conviction based on an improper hypothetical where the prosecutor equated the intent to pull the trigger of a weapon with the intent to cause the death of an individual. The defense in that case exhausted its peremptory challenges and requested additional challenges. The defendant was granted a single additional challenge "to make up for the fact that a venireman who had been accepted was later disqualified for reasons of health." *Id.* After exercising this final challenge, the defense requested more specifying the failure of the trial court to exclude certain venireman who were tainted by the State's improper example, along with the fact that the twelfth juror selected was objectionable. Again, as in *Lane*, supra, the defendant showed harm and preserved the error.

In capital cases, both the defendant and the State are entitled to fifteen peremptory challenges. Article 35.15(a), V.A.C.C.P. In the instant case, the jury strike list indicates that neither the State nor the defendant exhausted their peremptory challenges. At the conclusion of voir dire the appellant had two peremptory challenges remaining which he failed to exercise. To show harm the defendant must exhaust his peremptory challenges. *Felder v. State*, 758 S.W.2d 760, 766–767 (Tex.Cr.App.1988) (defendant must show that he has been forced to exercise peremptory challenge to excuse prospective juror to whom defendant's challenge should have been sustained); *Cantrell v. State*, 731 S.W.2d 84, 94 (Tex.Cr.App.1987) (nothing presented for review where appellant did not allege and record did not show that he asked for additional peremptory challenges). Under these circumstances, as in *Gardner*, supra, any harm rendered by appellant having to exercise a peremptory challenge to exclude an objectionable juror is rendered invalid. Accordingly, appellant's sixteenth and seventeenth points of error are overruled.

The judgment of conviction is affirmed.

CLINTON and TEAGUE, JJ., concur in result.