Jerry Wayne **MELTON**, Appellant,

v.

The **STATE** of Texas, Appellee.

Jimmie Lee **SLOAN**, Appellant,

v.

The **STATE** of Texas, Appellee.

Nos. 65165, 65166.

Court of Criminal Appeals of Texas, En Banc.

July 2, 1986.

John D. Byers, Sulphur Springs, for appellants.

Robert Huttash, State's Atty., Austin, for State.

OPINION

McCORMICK, Judge.

Both appellants were indicted for the offense of theft over $200.00. At a joint trial during which the appellants were represented by separate counsel, they were found guilty and both were assessed punishments of five years.

The appellants, represented by the same counsel on appeal, have each filed a brief. A review of these briefs show them to be identical to one another with the exception of an additional ground of error present in appellant Sloan's case. The State has not seen fit to file any briefs. The state of the appellants' briefs leaves much to be desired. Because the two briefs are identical to one another except in the one respect we have pointed out, we find that many contentions that are made do not apply to both appellants. Moreover many of the grounds of error are multifarious; they do not cite to any authority and contain no argument.

Nevertheless, we have reviewed the contentions as best as we can determine what they are and have found reversible error in each case.

Department of Public Safety Investigator Jimmy Jacobs testified that on or about October 11, 1978, he received information from an individual named Bo Lemmons that an individual was selling stolen heavy equipment. Lemmons was an ex-convict whom Jacobs had had under surveillance because Jacobs suspected that Lemmons was himself involved in some type of illegal activities. As a result of this information, on the evening of October 11, Jacobs, working in an undercover capacity, telephoned appellant Melton and told him that he had heard that Melton had a D–8 bulldozer for sale. Melton replied that he not only had a D–8 bulldozer but also had a John Deere front-end loader which he wished to sell. The two men agreed on a price of $6500 for the D–8 Caterpillar bulldozer and $2,000 for the John Deere front-end loader. Melton indicated to Jacobs that he had the two pieces of equipment and was prepared to deliver them. A deal was struck whereby Melton agreed to deliver the John Deere front-end loader to the Winfield Truck Stop on Saturday, October 14, where Jacobs was to meet him. On Saturday, October 14, Jacobs waited for Melton at the Winfield Truck Stop but Melton never appeared. After waiting for three hours, Jacobs attempted to call Melton. Melton's wife answered the phone and said that Melton was not home. On October 15, Jacobs called Melton again. Melton told Jacobs he had not been able to deliver the equipment to the truck stop because his driver had been arrested for cattle theft and was in jail. Melton apologized and said that the next time the delivery would be completed.

On October 24, Jacobs called Melton again. When Jacobs asked what equipment Melton had, Melton replied that he had a White Freightliner truck and lowboy trailer with a 977 Caterpillar loader on it. Jacobs testified that he interpreted this to mean that Melton already had this equipment in his possession. Melton said he

would sell all three pieces of equipment for $10,000. Jacobs asked Melton to check the mileage on the truck and to see what kind of bucket was on the loader. An agreement was reached whereby Melton agreed to deliver the load to the Bonanza Steak House in Sulphur Springs on October 26. It was also agreed that Jacobs would call back the next day so that the plan could be finalized. On October 25, Jacobs called Melton back. Melton told Jacobs he could not check the truck's mileage but that the loader had a two or three yard bucket on it. He also told Jacobs that even though the equipment was worth at least $20,000, because it was "hot", he would sell it for $10,000. It was agreed that the delivery was to be made at 2:00 a.m. on October 27. The equipment was to be brought out on Interstate 30 and parked on the shoulder of the freeway directly in front of the Bonanza Steak House. Jacobs was to be parked between the service road and the freeway. It was also agreed that Jacobs would call Melton again on October 26.

On October 26, Jacobs called Melton's home and talked to Melton's wife. He left a phone number where he could be reached. At 9:00 that evening Melton called Jacobs and said he had the equipment and he could meet Jacobs sooner than planned but instead of the 977 Caterpillar loader, he was bringing a W–8 International front-end loader. Melton told Jacobs he would deliver the 977 loader the next weekend. The two agreed to meet at about 1:30 a.m. and to lower the price from $10,000 to $9,000 because of the change in equipment.

At about 1:25 a.m. Jacobs and another DPS officer Bob Shedd, were waiting alongside the freeway in Sulphur Springs. Melton drove up in a pickup and parked on the shoulder of the freeway. A truck and lowboy trailer carrying a front-end loader drove by and stopped approximately a quarter of a mile down the freeway. Melton and Jacobs got out of their vehicles and approached each other. At that point Jacobs arrested Melton and other officers in seven other police units converged on the scene and arrested appellant Sloan, who was driving the stolen White Freightliner.

Jacobs testified that the stolen equipment was a Model 4000 White Freightliner tractor, VIN 751629G, registered to Howard Freeman, Inc., in Irving, a Case W–8 front-end loader, VIN 9811831, and a lowboy trailer registered to Howard Freeman, Inc. in Irving. Jacobs testified that the truck was hot-wired. He further testified that the value of the truck would be $15,000, the value of the trailer would be $6,000 and the value of the W–8 loader would be $15,000. Finally Jacobs testified that he used no inducement, threats or coercion to get Melton to talk with him and that it was Melton who had set the initial $10,000 price on the equipment.

Appellant Melton took the stand and agreed that he and appellant Sloan stole the White Freightliner, lowboy trailer and the front-end loader. However, the gist of Melton's testimony was that he had been entrapped by both Lemmons and Jacobs. He testified that in the latter part of September 1978, he was working as a heavy equipment operator at a Dallas construction site when he was introduced to Lemmons. At this first meeting Lemmons asked Melton if he would be interested in dealing in stolen heavy equipment. Lemmons said he knew an individual who would pay a dollar a pound for heavy equipment that was in good shape. Melton testified that he told Lemmons he did not know anything about stealing equipment. In response, Lemmons told Melton to give him his phone number and he would have the buyer call him. Melton gave his phone number to Lemmons.

Two weeks later Lemmons telephoned Melton and said that a man named "Bill" would be calling him. The next day Melton received a phone call from "Bill." (This was in fact DPS Investigator Jacobs). According to Melton's testimony, when Jacobs asked him if he had any equipment for sale, Melton replied that he did not have anything. Jacobs then told Melton he would pay him $6500 for a D–8, $5,000 for a D–6 or $2500 for a backhoe. Once again Melton told Jacobs that he had no equipment, but

he would look around and see if he could find anything for him. Jacobs then called Melton a second time. When Jacobs asked Melton if he had anything, Melton replied that he did not. Jacobs then asked if Melton was going to get him anything in the future and Melton replied that he would. According to Melton, Jacobs called him daily pressuring him to get him some equipment. In addition, Melton testified that he received another visit from Bo Lemmons who told him that if he did not have a way of transporting the equipment, Jacobs would furnish him a trailer. Lemmons also told Melton that Jacobs was his banker and had a lot of money and pull.

According to Melton, the first purchase that was actually arranged concerned a Case backhoe. Melton testified that although he agreed with Jacobs to deliver the backhoe to the Winfield Truck Stop he had no intention of actually making the delivery. Melton testified that after he did not show up at the truck stop, Jacob's called his home again. Melton testified that during this conversation Jacobs appeared to be very angry and he told Melton that Melton's failure to bring the equipment had caused him to lose $1,000. Melton testified that at this point, he became very afraid of Jacobs because he thought Jacobs might be involved in the Mafia. He felt that if he did not furnish some equipment for Jacobs, he might be hurt. Thus when Jacobs called him on October 24, Melton told him he had something lined up. And when Melton spoke with Jacobs on October 26, he told Jacobs he already had the equipment although he had not in fact yet stolen it. Finally Melton testified that he never would have stolen the property if Jacobs and Lemmons had not exerted pressure on him.

Appellant Sloan did not testify. However Melton testified that he first involved Sloan in the scheme after he had agreed to deliver the backhoe to the Winfield Truck Stop. It is undisputed that neither Jacobs or Lemmons ever had any contact with appellant Sloan before Sloan's arrest.

Both appellants initially argue that the State failed to prove the ownership of the stolen property. The indictment alleged in pertinent part that the appellants:
"... did then and there with intent to deprive the owner, Howard Freeman of property, namely 1972 White Freightliner # 4000 VIN751629G and a 1955 Trailmobile Float VIN105305 and a Model W8G International loader VIN9811831, did knowingly and intentionally exercise control over and appropriate such property without the owner's effective consent, which property had a value of $200.00 or more but less than $10,000.00."

When the trial court applied the law to the facts in the application paragraphs of the appellants' charges, no mention of the Trailmobile Float and the International Loader was made:
"Therefore, if you believe from the evidence beyond a reasonable doubt that Howard Freeman was the owner of property, to-wit: a 1972 White Freightliner # 4000 VIN751629G, and that the [appellant], did, in Hopkins County, Texas, on or about October 26, 1978, knowingly or intentionally exercise control over and appropriate said property without the effective consent of the said Howard Freeman, and with the intent to deprive the said owner of the said 1972 White Freightliner # 4000 VIN751629G, which property had a total value of more than $200.00, you will find the defendant guilty."

The jury verdicts signed by the jury foreman read:
"We, the jury, find the defendant guilty of theft of over $200.00."

The only allegation as to ownership that the jury had to find in order to convict appellants was in relation to the 1972 White Freightliner. Our review of the evidence adduced at trial shows that Jimmy Jacobs, the investigator with the Department of Public Safety, testified that he ran a check on the truck stolen by the appellants and found that it was registered to Howard Freeman, Inc. of 1424 East Grauwyler Road in Irving. In addition, Howard

Freeman took the stand and testified that he was president of Howard Freeman, Inc. located at 1424 East Grauwyler in Irving. He testified that his company owned one model 4000 White Freightliner which was stolen on the night of October 26, 1978, along with a lowboy trailer and a W–8–E Case rubber tired loader. Freeman was shown a photograph of the truck stolen by appellants and testified that it appeared to be his truck. He further testified that the truck was valued at approximately $12,000. He also examined a picture of the W–8–G loader stolen by appellants and identified it as belonging to his company. Freeman testified that the lowboy trailer was valued at $6,000 and the loader valued at $8600. We find the evidence sufficient as to the ownership of the truck.

Appellants' third ground of error is worded as follows:

"THE COURT ERRED IN FAILING TO CONDUCT A HEARING ON ENTRAPMENT AS A MATTER OF LAW SINCE THE CASE IN CHIEF SHOWED AN ABUNDANCE OF EVIDENCE WHICH WOULD PROVE ENTRAPMENT AS A MATTER OF LAW."

A reading of the text under this ground of error suggests that appellants are contending that the trial judge should have found as a matter of law that they were entrapped.

A reading of the record compels us to find that the issue of entrapment was not raised with regard to appellant Sloan. We note that although the defense of entrapment is not available to a defendant that *denies* the commission of the offense, it is available to a defendant who pleads not guilty and who does not take the stand or offer any testimony inconsistent with the commission of the crime. *Norman v. State,* 588 S.W.2d 340, 345 (Tex.Cr.App. 1979). Thus in the instant case, where appellant Sloan did not testify, it is conceivable that he could still rely on the benefits of the entrapment defense. We now turn to the merits of his argument.

V.T.C.A., Penal Code, Section 8.06(a) provides as follows:

"It is a defense to prosecution that *the actor* engaged in the conduct charged because he was induced to do so *by a law enforcement agent* using persuasion or other means likely to cause persons to commit the offense. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment." (emphasis added)

The statute quoted above mandates that there must be a *direct link* between the defendant and the law enforcement agent. The *defendant* must be induced by the *law enforcement agent,* not by another co-defendant as we have in the present case. It was appellant Melton who had the contact with both Jacobs and Lemmons. It was appellant Melton who invited appellant Sloan to become involved in the offense. There is no showing in the record that any law enforcement agent ever made contact with appellant Sloan or induced him in any way. A similar argument was made in *Norman v. State, supra.* In *Norman* a panel of this Court rejected the defendant's defense of "vicarious" entrapment after it was shown that the law enforcement agent only had personal contact with an individual named Reyes who then induced the defendant's husband who then induced defendant to deliver heroin. The panel went on to hold:

"To hold otherwise would not advance the policy behind this "objective" test of entrapment as adopted by the Legislature in Section 8.06, supra, which is to deter police conduct violative of law enforcement standards in a civilized society. As stated, only the individual acted upon by the unscrupulous agent enjoys the benefit of the objective test in Section 8.06, supra. The Legislature in Section 8.06, supra, has balanced the benefit of the deterrent effect upon law enforcement agents of allowing unscrupulously induced defendants to go free, with the cost to society of allowing someone other than the directly induced defendant to avail himself of the defense. We note this same cost-benefit analysis has been applied to illegal search and seizure ex-

clusionary rule questions. The U.S. Supreme Court has balanced the benefit of the deterrent effect upon law enforcement agents who conduct illegal searches and seizures by suppressing the evidence illegally obtained therefrom with the cost to society of suppressing same. (citations omitted). The immediate and calculable "cost" of sustaining a "vicarious" entrapment defense outweighs the uncertain and therefore negligible deterrent value upon law enforcement agents.

"The Legislative intent espoused in Section 8.06, supra, to make entrapment a personal defense and the cost of an unrestricted extension of the defense do not allow vicarious invocation of the entrapment defense.

.        .        .        .        .

"The vicarious entrapment defense espoused by the appellant attentuates the 'cost-benefit' policy by allowing a defendant to discredit the inducement methods of State agents when she was never a party to such inducements. Such a policy would allow entrapment defenses by all defendants involved to prevail ad infinitum from the original improper use of governmental power by the State agent, regardless of whether each defendant was ever induced by the government to commit the crime in the first place." *Norman,* supra at 346.

Because the evidence presented at trial did not raise the issue of entrapment as to appellant Sloan, we overrule his ground of error.

■ Turning now to appellant Melton, we find that the issue of entrapment was raised. Normally, the factual issue of entrapment is a question for the jury, unless as a matter of law the accused has established beyond a reasonable doubt that he was entrapped. *Redman v. State,* 533 S.W.2d 29 (Tex.Cr.App.1976); *McKelva v. State,* 453 S.W.2d 298 (Tex.Cr.App.1970); *Jones v. State,* 427 S.W.2d 616 (Tex.Cr. App.1968). Where the evidence on the issue of entrapment is in conflict, the issue should be submitted to the jury. *Poe v. State,* 513 S.W.2d 545 (Tex.Cr.App.1974);

*Ransom v. State,* 630 S.W.2d 904 (Tex.App. —Amarillo 1982, no petition).

■ In *Redman v. State,* supra, after the undercover officer testified that he had bought marihuana from the defendant, the defendant testified that he sold marihuana to the undercover agent solely because of the agent's repeated requests and because he felt that his friendship with the agent depended on supplying him with marihuana. This Court held that since the issue of entrapment was controverted, the defendant had not proven entrapment as a matter of law and the issue was properly submitted to the jury. See also *Benavidez v. State,* 652 S.W.2d 486 (Tex.App.—Corpus Christi 1983, no petition).

In the instant case, the only testimony directly relating to the entrapment defense was given by appellant Melton and DPS Investigator Jacobs. The evidence supporting the claim of entrapment was given by appellant Melton. Officer Jacobs testimony, if believed, refuted Melton's defense of entrapment. Credibility of the witnesses was therefore crucial. As such, we hold that entrapment was not established as a matter of law and the issue of entrapment was properly submitted to the factfinder. *Starkey v. State,* 647 S.W.2d 350 (Tex.App. —Corpus Christi 1982, petition refused). Appellants' third ground of error is overruled.

■ In their seventh ground of error, appellants complain of several instances of improper jury argument by the prosecutor. Initially, we note that this ground of error is multifarious and fails to comply with Article 40.09(9) V.A.C.C.P. *Thiel v. State,* 676 S.W.2d 593 (Tex.Cr.App.1984); *Euziere v. State,* 648 S.W.2d 700 (Tex.Cr.App.1983); *Felder v. State,* 564 S.W.2d 776 (Tex.Cr. App.1978); *Nabors v. State,* 508 S.W.2d 650 (Tex.Cr.App.1974). Second, appellants' briefs contain no citation to authority or argument. The appellants have merely listed the instances of alleged improper conduct. This also is in violation of Article 40.09(9), supra. *McWherter v. State,* 607 S.W.2d 531 (Tex.Cr.App.1980); *Williams v.*

*State* 535 S.W.2d 637 (Tex.Cr.App.1976). Third, appellants' briefs only refer to the record by page numbers. Mere references to pages of the record do not sufficiently identify complained of testimony. *Thiel v. State,* supra.

Nevertheless we have reviewed this ground of error in the interest of justice and have found reversible error. During the prosecutor's closing argument during the guilt-innocence phase of the trial he argued the following:

"People, do you understand the quantity of what we're dealing with here today? Do you understand there is over three hundred Case backhoes out there missing, 580's?"

Appellant Sloan's counsel immediately objected on the basis that there was no evidence produced which connected the defendants to any other equipment other than what was alleged in the indictment. The trial court sustained this objection and ordered the jury to disregard the prosecutor's previous statement. When Sloan's counsel moved for a mistrial, the trial court overruled the motion. Then the prosecutor went on to argue the following:

"What did Jerry Wayne Melton talk about in his conversation? What are we talking about, one truck? No, we're talking about 977's, Case 580's, John Deere front end loaders. We're talking about D–8's, D–6's. We're talking about tractor trailer rigs, lowboy trailers. Folks, we're not talking about hubcap theft. We're talking about major theft. And, there is (sic) two major thieves right there in this courtroom."

■ In order to be appropriate, jury argument must fall within the areas of (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; or (4) a plea for law enforcement. *Alejandro v. State,* 493 S.W.2d 230 (Tex.Cr.App.1973).

■ Clearly the prosecutor in the instant case was trying to persuade the jury that these defendants were responsible for more than just the offense alleged in the instant indictment and to convict them on that basis. Such argument was totally outside the record and impermissible. *Turrentine v. State,* 536 S.W.2d 219 (Tex.Cr. App.1976); *Thomas v. State,* 527 S.W.2d 567 (Tex.Cr.App.1975); *Rodriquez v. State,* 520 S.W.2d 778 (Tex.Cr.App.1975). See also *Walker v. State,* 664 S.W.2d 338 (Tex. Cr.App.1984).

■ Ordinarily, any injury from an improper jury argument is obviated when the court instructs the jury to disregard the argument, unless the remark is so inflammatory that its prejudicial effect cannot reasonably be removed by such an admonishment. *McKay v. State,* 707 S.W.2d 23 (Tex.Cr.App.1985).

■ In *Simpson v. State,* 493 S.W.2d 793 (Tex.Cr.App.1973), the defendant was charged with the offense of selling heroin. During the punishment phase of the trial the prosecutor argued that not only had Simpson sold heroin on the date alleged in the indictment but also on three other occasions. This Court found that where there was no such evidence in the record, the prosecutor's remark was highly improper and prejudicial. Furthermore the Court held that although the trial court instructed the jury to disregard the prosecutor's statement, the instruction was insufficient to cure the error. We find a similar situation in the instant case. The prosecutor's tactic of imputing to the defendants the responsibility for the theft of 300 other pieces of heavy equipment was so prejudicial that we have no other alternative but to reverse the appellants' convictions. See also *Lopez v. State,* 500 S.W.2d 844 (Tex.Cr.App.1973).

Accordingly, the judgments are reversed and remanded.

TEAGUE, J., agrees that the appellants' convictions must be reversed because of improper jury argument, but disagrees with the majority opinion's disposition of appellant Melton's third ground of error.

WHITE, J., concurs in the result.

ONION, P.J., not participating.