**Trudy Janette CAMPBELL, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 13–91–183–CR.**

Court of Appeals of Texas,
Corpus Christi.

May 28, 1992.

William E. Satterwhite, Jr., Will Gray, Houston, for appellant.

John Holmes, Jr., Alan Curry, Greg Serres, Houston, for appellee.

Before NYE, C.J., and KENNEDY and FEDERICO G. HINOJOSA, JJ.

## OPINION

KENNEDY, Justice.

A jury found appellant guilty of possessing cocaine with intent to deliver. The trial court assessed punishment at fifteen years in prison and a $1,000 fine. By two points of error, appellant complains about the sufficiency of the evidence on her entrapment defense and asserts that the prosecutor committed reversible error during jury summation. We affirm.

By point two, appellant claims that the evidence is insufficient to show that the State disproved her entrapment defense beyond a reasonable doubt.

■ Entrapment is a defense to prosecution when the actor engaged in the conduct charged because he was induced to do so by a law enforcement agent using persuasion or other means likely to cause persons to commit the offense. Tex.Penal Code Ann. § 8.06(a) (Vernon 1974). Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment. *Id.*

■ The entrapment defense is available when the criminal design originates in the mind of government officials or their agents, and they induce a defendant to commit a crime that the defendant would not otherwise commit. *Sebesta v. State,* 783 S.W.2d 811, 814 (Tex.App.—Houston [1st Dist.] 1990, pet. ref'd) (citing *Richardson v. State,* 622 S.W.2d 852, 854 (Tex. Crim.App.1981)). The issue is whether appellant was induced to engage in the alleged penal conduct through persuasion or other means likely to cause persons to commit the offenses, or merely was afforded an opportunity to commit them. *Rodriguez v. State,* 662 S.W.2d 352, 355 (Tex. Crim.App.1984). This is purely an objective test, and the trier of fact must focus solely upon the State's actions.

■ Under the objective standard, prohibited police conduct usually includes, but is not limited to, matters such as extreme pleas of desperate illness in drug cases, appeals based primarily on sympathy, pity, or close personal friendship, offers of inordinate sums of money, and other methods of persuasion which are likely to cause an otherwise unwilling person—rather than the ready, willing, and anxious person—to commit the offense. *Sebesta,* 783 S.W.2d at 814. However, we also note that the presence of a close personal relationship does not establish entrapment as a matter of law. *Id.; Saldana v. State,* 732 S.W.2d 701, 703 (Tex.App.—Corpus Christi 1987, no pet.).

■ When weighing the sufficiency of the evidence, we determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt, and also could have found against appellant on the entrapment issue beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Saxton v. State,* 804 S.W.2d 910, 914 (Tex.Crim.App. 1991); *Butler v. State,* 769 S.W.2d 234 (Tex.Crim.App.1989); Tex.Penal Code Ann. § 2.03(d) (Vernon 1974).

■ In November 1989, Frank Michael McDaniel, an agent with the Drug Enforcement Administration (D.E.A.), received information from James Paul Harris, an informant. Harris contracted with the D.E.A. to give them information about narcotics trafficking and then to testify in

those cases in exchange for a lower sentence on a federal narcotics charge pending against him.

At trial, McDaniel testified about the events leading to appellant's arrest. On this particular occasion, Harris informed McDaniel sometime in November 1989, that Kevin Jerome Johnson was trafficking cocaine in the Houston area and was using several individuals to transport large amounts of cocaine. Harris learned that Johnson was having difficulty with his usual cocaine suppliers and was looking for a steady supply source.

After receiving this information, the D.E.A. planned a reverse undercover operation, whereby D.E.A. agents sell narcotics to the defendant and then arrest the defendant after he takes custody of the narcotics. In this undercover operation, Harris was to act as the supplier with McDaniel as his partner. Agents then began surveillance of Johnson.

On March 23, 1990, Harris told McDaniel that appellant and Johnson would meet him later in the day at his office to negotiate a purchase of a large quantity of cocaine. During the meeting, McDaniel conducted surveillance, and observed both Johnson's and appellant's cars in the parking lot. About twenty minutes later, McDaniel observed appellant and Johnson go to their cars and drive away.

It was McDaniel's understanding that appellant knew both Harris and Johnson and introduced them for the purpose of purchasing cocaine. Harris told McDaniel appellant was a personal friend and that he did not want to see her prosecuted as a result of the investigation. McDaniel told Harris he would try to keep appellant out of the negotiations and deal only with Johnson. McDaniel never told Harris who would be arrested at the conclusion of the undercover operation. McDaniel explained that frequently, informants use a friend to get to another drug trafficker. McDaniel tried to completely segregate appellant from any narcotic investigation and attempted to negotiate and deal strictly with Johnson. As the transaction proceeded, however, it became impossible to keep appellant out of the negotiations. McDaniel tried up until the last day of the operation to keep her out of the negotiations; however, she was continuously involved. In fact, the only conversations with potential buyers were with appellant who also was the only person presenting money for the cocaine.

On March 24, 1990, Harris informed McDaniel that Johnson showed him $21,000, and wanted to purchase one kilogram as a test run to make sure that the transaction went well before buying larger quantities. McDaniel told Harris to tell Johnson that they could not do the one kilogram deal, that Johnson would need to purchase between three and ten kilograms. Later in the day, Harris informed McDaniel that Johnson said he would purchase the larger quantity after first buying a one-ounce test amount.

McDaniel then arranged for a one-ounce sale for $900, to take place at a Bennigan's restaurant south of Houston. McDaniel, Harris, appellant, and a third-party supplier met at Bennigan's and transacted the one-ounce sale. The supplier was leery of dealing with people he did not know so he left the one ounce of cocaine under the seat of his truck. To do the deal, McDaniel told Harris that he would have to take appellant out to the truck and then bring the money in and pay the supplier. Harris and appellant went to the truck, but only Harris returned to the restaurant with the money. Appellant did not return to the restaurant.

The next step in the operation occurred on Monday, March 26, 1990. Harris told McDaniel that Johnson was ready to buy five kilograms of cocaine. However, the D.E.A. was not ready to complete the sale that night because they did not have the manpower available due to another drug operation. Monday evening, McDaniel went to the T.G.I. Friday's south of Houston to meet with Harris and appellant. It appeared to McDaniel that appellant thought that they were going to complete the deal that night. McDaniel told appellant that they would do the deal the following day. To McDaniel, appellant appeared very worried and said she was afraid John-

son would respond angrily to her when he found out that the deal was not occurring that evening. When McDaniel told appellant that the deal would not happen that night, she asked that Harris go with her while she phoned Johnson to tell him the deal would happen the next day. She wanted Harris to go with her to make the call so in case Johnson got angry, she could put Harris on the phone to explain to Johnson the reason for delaying the sale.

During the conversation at T.G.I. Friday's, appellant told McDaniel that Johnson was very particular about the purity of the cocaine and that it had to be the best quality or he would not conduct further business with Harris and McDaniel. The conversation continued and the three discussed exactly what would transpire the following day. Appellant told McDaniel exactly what she wanted to happen including which hotel to check in to. Appellant asked him to check in to the Hilton Hotel on Airport Drive. Appellant told him that she picked that location because it was close to "my man's house." She explained that Johnson owned a house on Bellfort near the Hilton and that she could take back streets from the hotel to his house, thereby avoiding police encounters. Appellant told McDaniel that the price would be $20,000 per kilo with $60,000 as a down payment and that within one day after the transfer was completed, he would receive the remaining $40,000. As for actually executing the transaction, appellant told McDaniel that she would go to Johnson's house and get the money from him. She would then bring the money to McDaniel at the hotel and take the cocaine back to Johnson.

On March 27, 1990, the D.E.A. agents went to the Pasadena Police Department and obtained five kilograms of cocaine for the transaction with appellant and Johnson. After obtaining the cocaine, McDaniel, along with other agents, went to the hotel specified by appellant and checked in to two adjoining rooms, one for surveillance, the other to transact the sale.

The down payment price changed, but Harris told McDaniel that the remaining $50,000 would be paid the next day. Appellant arrived at the hotel room and gave $50,000 to McDaniel, who then told appellant where the car containing the cocaine was located. After delivering the cash, McDaniel gave appellant the keys and she drove off in the car with the cocaine. D.E.A. agents conducted continuous surveillance of the car to make sure no one other than appellant tampered with the car containing the cocaine. After appellant left the hotel, agents followed her to Johnson's house. Later, appellant was arrested when she attempted to drive away from Johnson's house in the car containing the cocaine.

Harris also testified at trial, giving a different version of events than McDaniel. He explained to the jury that as part of an agreement with the government, he was an informant for the D.E.A. In exchange for informing and testifying on three occasions, he would receive a reduced sentence on a federal drug charge pending against him. According to Harris, appellant never introduced him to Johnson. Rather, Harris asked a business associate to introduce him to Johnson who he knew was dealing drugs in the Houston area. Harris knew appellant was a cocaine addict and that she regularly purchased cocaine from Johnson. Harris, after learning about Johnson, informed McDaniel about him, after which Harris knew McDaniel was investigating Johnson for a possible drug operation.

According to Harris, McDaniel never really told him what to do as far as setting up the details for the reverse operation. McDaniel was only interested if Harris could get Johnson to agree to buy a certain amount of cocaine and then Harris could use the transaction as one of the three required as part of his agreement with the government. Harris had several conversations with Johnson before negotiating the final deal. To Harris, Johnson appeared to be a shrewd individual, because he would not deal with Harris directly on the first transaction. Harris talked with McDaniel and told him that he wanted to use appellant in the operation against Johnson. Harris asked McDaniel to give appellant immunity if she got involved. Harris told

McDaniel that if he used appellant he thought the deal would go smoothly and that he could get the drugs to Johnson. According to Harris, McDaniel told him that he could provide that appellant would not be prosecuted.

Harris explained that he and appellant had been friends for more than ten years, that they had been lovers, and that he had bought her many gifts including jewelry and a house. Harris told appellant that he was in trouble and needed her help. Harris did not tell appellant he was in trouble with the government because he was afraid she would not act naturally if she knew the truth and might get hurt doing the cocaine deal.

Harris explained that he organized the drug deal and that Johnson was supposed to attend the meeting at T.G.I. Friday's. However, since Johnson refused, Harris brought appellant to meet McDaniel so she would know to whom to give the money and from whom to get the drugs. According to Harris, at this meeting appellant said nothing and did not participate in any of the negotiations.

The transaction plan was appellant would pick up the money from Johnson, take it to the hotel, pick up the D.E.A.'s car containing the cocaine, deliver the cocaine to Johnson, and then return the car to the hotel. Harris instructed her that before she returned the car, to take one ounce of cocaine and one thousand dollars for herself and then leave. Harris explained that appellant was working for him on the selling side of the transaction throughout the operation. As things turned out, the cocaine never left the trunk of the D.E.A. car and appellant was arrested while attempting to leave Johnson's house in the car with the cocaine.

Appellant testified at trial and presented her version of the facts to the jury. She and Harris were seeing each other daily before the investigation into Johnson's activities began. Harris told appellant that he was in trouble and needed her help. Harris begged her to help him no matter what it was that he asked of her. Appellant told Harris she really needed to know what he was asking her to do, but rather than tell her, he just kept begging for her help.

At the time, appellant was not employed, but was doing odd jobs for Harris. The first time she learned about the drug deal was when she went to Harris' office on March 23, 1990. On that day, she walked into Harris' office and saw him talking with Johnson, who she knew was a cocaine dealer.

At the time, appellant abused cocaine. She had bought drugs from Johnson but had never dealt drugs for him. The most she ever purchased from Johnson was $100 worth of drugs and she explained that he had never entrusted her with any large sum of money.

Appellant attended the meeting at T.G.I. Friday's, but took no part in the discussion about price or anything else related to the drug deal. The next morning, March 27, 1990, she went to Harris' office and waited for his call. Harris called and told her to go to Johnson's house, pick up the money, take the money to McDaniel at the hotel, then take the cocaine back to Johnson, and take for herself an ounce of cocaine and one thousand dollars. Throughout the undercover operation, as far as she knew, she was doing a favor for Harris.

When determining the sufficiency of the evidence to disprove a defendant's statutory defense, the State is not required to affirmatively produce evidence that refutes defendant's statutory defense. *Saxton*, 804 S.W.2d at 913. When evidence on the issue of entrapment is controverted, the issue is one for the jury to decide. *Melton v. State*, 713 S.W.2d 107, 113 (Tex. Crim.App.1986). The jury is free to reject or accept defensive evidence. *Saxton*, 804 S.W.2d at 914. In this case, the jury was free to reject the testimony of Harris and appellant that purportedly supported appellant's entrapment defense. *See Melton*, 713 S.W.2d at 113; *Redman v. State*, 533 S.W.2d 29, 32 (Tex.Crim.App.1976).

When viewing the evidence in the light most favorable to the prosecution, the evidence reflects that appellant was the person who introduced Harris to Johnson for

purposes of conducting the narcotics transaction. Appellant was continuously involved in negotiations, and D.E.A. agents and Harris were unable to keep appellant out of the transaction. Appellant was involved in negotiating the specifics of the transaction, including the purity and the price of the cocaine, the manner of payment, the specific transaction location, and the manner in which the cocaine and the money would be transported and exchanged. During the negotiations, appellant referred to Johnson as "my man," and the jury was free to infer appellant was Johnson's employee.

While the State's evidence may not have controverted all of appellant's testimony, particularly regarding her relationship with Harris, the State's evidence did show that appellant was acting more than merely upon Harris' instructions. The jury, as the trier of fact, was authorized to weigh the evidence and draw a conclusion from the circumstances that appellant was not induced to commit the offense.

When viewing the evidence in the light most favorable to the prosecution, we conclude the evidence is sufficient to show appellant possessed the cocaine with intent to deliver and was not entrapped into committing the offense. We overrule point two.

By point one, appellant contends that the prosecutor erred by making comments during his final argument to the jury. Appellant complains about the following remarks:

> Prosecutor: You don't have to consider whether or not this defendant would be moved by Mr. Harris asking her a favor. You have to consider whether or not persons in general would commit this type of offense if Paul Harris came up to you, you or I, and said hey, will you do me a favor, will you be involved in a million dollar drug deal.
>
> Defense Attorney: I object to that, that's incorrect, it's an incorrect statement of the law as far as coming up to you, you or I, Paul Harris. We are strangers.

The Court: Now, you are arguing for the facts. Go ahead. Appellant concedes that

the trial court did not rule adversely on her objection.

Error is not preserved absent an adverse trial court ruling which appears in the record. *Darty v. State*, 709 S.W.2d 652, 655 (Tex.Crim.App.1986). Appellant's attorney should have obtained a definite ruling from the trial court on the record. *Id.*

Appellant claims that this statement by the prosecutor shifted the jury's focus from the actions of the law enforcement agents to appellant's predisposition to commit the offense. Appellant argues that the prosecutor's jury argument was so egregious that reversal of this conviction is required even though appellant's counsel failed to obtain a final ruling on his objection. We disagree. The trial prosecutor urged the jury to consider whether persons in general would commit this type of offense. He continued by stating, "if you find that a person in general would not be persuaded by whatever means Paul Harris used to be involved in this drug deal, then you can't find entrapment." Error, if any, caused by the trial prosecutor's argument could have been cured by an instruction to disregard, and would have been sufficient to preclude any effect upon the jury's verdict. Tex.R.App.P. 81(b)(2). We overrule point one.

We affirm the trial court's judgment.