11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

Norman Leroy O=Dell

Appellant

Vs.                   Nos. 11-02-00085-CR &
11-02-00086-CR B Appeals from Taylor County

State of Texas

Appellee

 

In Cause
No. 11-02-00085-CR, the jury convicted Norman Leroy O=Dell of the offense of solicitation of
capital murder and assessed his punishment at confinement for 50 years.[1]  In Cause No. 11-02-00086-CR, the jury
convicted appellant of the offense of delivery of methamphetamine in the amount
of 4 grams or more but less than 200 grams. 
The jury assessed his punishment at confinement for 25 years.[2]  The trial court ordered the sentences to run
concurrently.  We affirm.

                                                        Cause
No. 11-02-00085-CR

Appellant
presents three points of error.  In his
first two points, he complains that the trial court erred in refusing to permit
his expert witness, Dr. Mark Cunningham, to testify during the guilt/innocence
phase of the trial.  In his third point,
appellant asserts that the evidence was factually insufficient to support the
conviction for the offense of solicitation of capital murder. 








We first
address appellant=s
complaint that the evidence was factually insufficient to support his
conviction for the offense of solicitation of capital murder.  To determine if the evidence is factually
sufficient, we must review all of the evidence in a neutral light and determine
whether the evidence supporting guilt is so weak as to render the conviction
clearly wrong and manifestly unjust or whether the evidence supporting guilt,
although adequate when taken alone, is so greatly outweighed by the
overwhelming weight of contrary evidence as to render the conviction clearly
wrong and manifestly unjust.  Vasquez v.
State, 67 S.W.3d 229, 236 (Tex.Cr.App.2002); Goodman v. State, 66 S.W.3d 283
(Tex.Cr.App.2001); Johnson v. State, 23 S.W.3d 1, 11 (Tex.Cr.App.2000); Cain v.
State, 958 S.W.2d 404 (Tex.Cr.App.1997); Clewis v. State, 922 S.W.2d 126
(Tex.Cr.App.1996).  We review the fact
finder=s weighing of the evidence and cannot
substitute our judgment for that of the fact finder.  Cain v. State, supra; Clewis v. State, supra.  Due deference must be given to the jury=s determination, particularly concerning the
weight and credibility of the evidence. 
Johnson v. State, supra; Jones v. State, 944 S.W.2d 642
(Tex.Cr.App.1996), cert. den=d, 522 U.S. 832 (1997).  This
court has the authority to disagree with the fact finder=s determination Aonly when the record clearly indicates such a
step is necessary to arrest the occurrence of a manifest injustice.@ 
Johnson v. State, supra at 9.        


Section
15.03(a) provides that a person commits the offense of criminal solicitation
if:

[W]ith intent that a capital felony or felony
of the first degree be committed, he requests, commands, or attempts to induce
another to engage in specific conduct that, under the circumstances surrounding
his conduct as the actor believes them to be, would constitute the felony or
make the other a party to its commission.

 

The indictment, which was
based on the language of Section 15.03(a), reads in relevant part that
appellant:

[D]id then and there with intent that Capital
Murder be committed, request, command, and attempt to induce CLAY WOODS to
engage in specific conduct, to- wit: to engage in the murder of CORKY WRISTEN
for remuneration and the promise of remuneration, that under the circumstances
surrounding the conduct of CLAY WOODS, as the said NORMAN LEROY ODELL believed
them to be, would constitute Capital Murder. 

 








At trial,
the State presented three witnesses: 
Marty Baker, the Assistant Commander of the West Texas Interlocal Crime
Task Force; Clay Woods, an agent with the West Texas Interlocal Crime Task
Force; and Eddie Lee Dickie, the supervisor of the Department of Public Safety
Crime Laboratory.  The State introduced
10 exhibits, including a tape recording of a March 7, 2001, telephone call
between appellant and Michael Ellis (appellant=s cousin); tape recordings of March 8, 2001, and March 12, 2001,
telephone calls between appellant and Agent Woods; and a videotape of a meeting
between appellant and Agent Woods at the Fairfield Inn in Abilene on March 12,
2001.  Appellant presented five
witnesses:  Brice Cribbs; Quata
Saldivar; Starla Smith; appellant; and Dana Gore.

Assistant
Commander Baker testified that on March 6, 2001, he received a telephone call
from Joe Stokes, a Runnels County deputy sheriff.  At that time, Ellis was an inmate in the Runnels County Jail.  Ellis had provided Deputy Stokes with some
information about appellant, and Deputy Stokes passed the information on to
Assistant Commander Baker.  Based on the
information, on March 7, 2001, Assistant Commander Baker traveled to the
Runnels County Jail to meet with Ellis. 
Assistant Commander Baker visited with Ellis for about two hours and
then requested Ellis to call appellant. 
Ellis made the call, and Assistant Commander Baker recorded it.  The tape recording was admitted into
evidence and played for the jury. 

During the
call, Ellis told appellant that he had somebody who could take care of
appellant=s  ACorky problem.@  Appellant responded that A[he] need[ed] it took care of@ and that A[i]t need[ed] to be done bad.@ Ellis told appellant that the person=s name was AJimmy,@ that he would give AJimmy@ appellant=s
phone number, and that appellant and AJimmy@ could work out the details.  Ellis 
stated that AJimmy@ would refer to Ellis by his nickname ACrash@ and would not use Ellis=s real name.  Ellis also stated
that he was about to be released from the Runnels County Jail because the
misdemeanor charge against him was going to be dismissed. 

Assistant
Commander Baker determined that ACorky@ was Corky Wristen.  Assistant Commander Baker assigned agent Agent Woods to the
investigation. 

Agent
Woods testified that he had been employed as a narcotics investigator with the
drug task force since 1983.  Agent Woods
went undercover as AJimmy@ in the investigation to meet with appellant
and to gather evidence. 








On March
8, 2001, Agent Woods telephoned appellant. 
Agent Woods recorded the call, and the tape recording was admitted into
evidence and played for the jury. 
During the call, Agent Woods identified himself as AJimmy@ and stated that Crash told him to call.   Agent Woods stated that Crash told  him Ayou
was having a problem.@  Appellant responded, AYeah, I do,@ and stated that his problem had gotten worse.  Appellant stated that Wristen was talking
about him manufacturing drugs.  Agent
Woods stated that Crash told him something about A10@ and that, if Agent Woods had to do anything
more, he would get extra.  Agent Woods
testified that this meant appellant would deliver to him A10@ grams of methamphetamine for killing Wristen.  Agent Woods asked appellant if he had
anything on him.  Appellant responded
that he only had one-half of a gram because Aweather problems@ were causing him not to be able to do a Adeal.@ 
Agent Woods testified that appellant=s Adeal@ meant appellant=s manufacturing of methamphetamine; Aweather problems@ meant that bad weather was preventing appellant from being able to
cook good methamphetamine.  Agent Woods
asked appellant whether he Aought to be able to come up with them 10.@  Appellant responded that it
would be no problem as soon as the weather cleared up.  Agent Woods also asked appellant whether
appellant had the Aheater.@ Appellant stated that he did.  Appellant stated that they needed to get
together for a meeting, and Agent Woods agreed.  Agent Woods stated that he would call appellant on March 12. 

On March
12, the task force secured two rooms at the Fairfield Inn in Abilene.  Agent Woods was in Room 118, and his
coworkers were in Room 116, an adjacent room. 
The rooms were wired with audio and video so that Agent Woods=s coworkers could monitor his conversations
with appellant.  There was a camera in
Room 118 in the alarm clock on the night stand. 

Agent
Woods called appellant and recorded the call. 
The tape recording was admitted into evidence and played for the
jury.  Agent Woods asked appellant if
appellant had anything for him. Appellant responded, AI do.@  Appellant stated that he had
to go by the Shootin= Shop
to get a clip for the gun.  Agent Woods
said that he thought he could get a clip if appellant did not want to go by and
get it.  Agent Woods told appellant that
he was in Room 118 at the Fairfield Inn. 
Appellant stated that he could be there in the next 30 minutes.  Agent Woods asked appellant to give him a
call when he arrived at the Fairfield Inn. 
Appellant said that he would. 
Agent Woods wanted to know when appellant arrived so that he could let
his coworkers know.  Agent Woods
testified that the task force put appellant under surveillance before appellant
left his house. 

Appellant
called Agent Woods when he arrived at the Fairfield Inn.  Agent Woods told him how to get to the
room.  Agent Woods recorded the
call.  The tape recording was admitted
into evidence and played for the jury.  









Appellant
went to Room 118.  The meeting was
videotaped.  The videotape was admitted
into evidence and played for the jury. 
The meeting lasted for 12 minutes. 
During the meeting, appellant gave Agent Woods a note that contained
details about Wristen, including his name, address, information about his
vehicles, and his girlfriend=s address.  Wristen lived in
Santa Anna, and his girlfriend lived in Abilene.  Appellant told Agent Woods where Wristen=s girlfriend worked. Appellant told Agent
Woods that Wristen was talking about appellant=s drug manufacturing and where he was doing it.  Appellant stated that Wristen had turned on
him after they got arrested in Baird. 

Appellant
gave Agent Woods the handgun without the clip and wrapped in a towel.  Appellant tossed the drugs onto the
table.  Agent Woods stated, AWhat do you got there?@  Appellant
responded, A10.@  Agent Woods picked up the
drugs.  Appellant explained that the
drugs were bagged in individual bags. 
Appellant stated that the drugs were from a batch he had prepared the
night before and ought to be excellent. 
Appellant stated that he Adid some@ that day. 

Appellant
stated that he preferred that Agent Woods do the job in Santa Anna rather than
in Abilene and that Wristen=s girlfriend, Linda, would be left out of it.  Appellant understood that he would have to pay Agent Woods an
additional 10 grams if Agent Woods also had to take care of her.  Appellant stated that it would hurt Linda
more if she was left to live with it.  

Appellant
stated that he had thought about giving Wristen an Aass kicking@ himself.  Agent Woods asked
appellant, AYou do want him dead though, don=t you?@  Appellant stated, AHell yeah.@ Agent Woods stated that he just needed to make sure because he didn=t want to kill someone that appellant didn=t want killed.  Agent Woods and appellant talked for about two more minutes, and
then appellant left the room.  Appellant
was arrested after he left the room.  

Agent
Woods testified that he stuck the drugs in his pocket.  When he got back to his office, he booked
the drugs into the task force=s evidence vault.  On April 11,
2001, Agent Woods retrieved the drugs from the evidence vault and took them to
the D.P.S. lab for testing. 








Officer
Dickie testified that he was the supervisor for the D.P.S. Crime Laboratory and
that he had been employed by the D.P.S. for 27 years.  Officer Dickie testified that his job duties included receiving
and analyzing evidence submitted by peace officers from the State of
Texas.  In this case, Agent Woods
submitted the evidence to Stella Swim, a D.P.S. laboratory technician.  Officer Dickie testified that Swim assigned
the evidence the unique case number L4A-38791, placed the evidence in an
envelope, and wrote the case number on the envelope.  The evidence was placed in the D.P.S. evidence vault to remain
there until Officer Dickie could analyze it.     

Officer
Dickie opened the envelope for testing the evidence.  Officer Dickie testified that there were ten bags that contained
a brown powdery substance.  The ten bags
were in two different bags.  Officer
Dickie performed a spot test on the powdery substance in each of the ten bags
to determine whether the bags contained the same substance.  After determining that the bags did contain
the same substance, he combined the substances from the bags.   The aggregate weight of the brown powdery
substance was 9.6 grams.  He then ran a
gas chromatograph mass spectroscopy test which showed that the substance
contained a controlled substance: methamphetamine.  Officer Dickie testified that the term Acontrolled substance,@ by definition, included the aggregate weight
of any mixture containing a controlled substance.  The brown powdery substance was a mixture containing the
controlled substance methamphetamine.  Therefore,
Officer Dickie testified that the tested substance was a controlled substance
with an aggregate weight of 9.6 grams. 

After the
testing, Officer Dickie sealed the methamphetamine in the two bags that Agent
Woods had submitted and the outside envelope and placed the envelope in the
D.P.S.=s evidence vault.  Officer Dickie testified that on November 12, 2001, the evidence
was returned to Agent Woods.  Agent
Woods testified that he retrieved the evidence from the D.P.S. and booked it
into the task force=s
evidence vault, that the evidence remained in the vault until he took it out
for the purpose of bringing it to trial, and that the evidence was not opened
until he testified at the trial. 








Appellant
called Brice Cribbs and Quata Saldivar as witnesses.  Cribbs and Saldivar lived together in Eula, Texas.  Cribbs testified that he had known and
worked with appellant for years. 
Appellant visited him frequently at his house.  Appellant brought Ellis with him to Cribbs=s house 10 or 15 times.  Cribbs did not trust Ellis.  Cribbs also knew Wristen.   On the day that appellant and Wristen were
arrested in Baird, they had been at Cribbs=s house.  Appellant and Wristen
had shown up at Cribbs=s
house separately to visit him. 
Appellant and Wristen left together in appellant=s pickup to go to Baird.  Later that day, appellant and Wristen were
arrested in Baird.  Cribbs knew that
Wristen was seeing appellant=s former girlfriend, Linda. 
Cribbs testified that Wristen and Linda told him that there was a big
conflict going on between appellant and them. 
Cribbs did not know of any ill feelings from appellant toward Wristen,
but he knew Wristen was fearful of appellant. 
From being around Wristen and Linda and also being around appellant,
Cribbs did not believe that there was any danger involved. 

Saldivar
testified that appellant and Cribbs were friends.  She saw appellant when he would come to visit Cribbs.  She trusted appellant.  She also knew Ellis, but did not trust
him.  She testified that Wristen was
afraid about his relationship with Linda. 
She stated that she never saw appellant do anything to justify Wristen
being afraid of him, nor did she ever see appellant make any threats. 

Starla
Smith, appellant=s ex-wife, also testified.  Smith and appellant were married in 1979 and
divorced three years later but remained friends.  She never knew appellant to do anything harmful to anybody.  She never heard appellant threaten
anyone.  Appellant never indicated any
open hostilities toward Wristen and Linda. 
Appellant never committed any acts of violence toward her or threatened
her.  Ellis threatened her one
time.  She also heard him make threats
against other people. 

Appellant
testified that he and Ellis are cousins. 
Ellis had lived with appellant when Ellis was on parole.  Ellis introduced appellant to
methamphetamine several years ago.  At
first, appellant was an occasional user; but, after his grandmother died in
February of 2000, he became a daily user. 
Appellant manufactured speed, using the Nazi method to cook the
drugs.  Appellant sold some of the speed
that he manufactured.  Appellant
testified that his use of speed slowed him down mentally and that it affected
his ability to remember things. 








Appellant
testified that he and Wristen were arrested in Baird for unlawful carrying of
anhydrous ammonia in an unsafe container in January 2001.  He and Wristen had been at Cribbs=s house in Eula.  Wristen had asked appellant about drugs and stated that he was
interested in an anhydrous ammonia tank but that he had never seen an anhydrous
ammonia tank.  Appellant took Wristen to
downtown Baird where he had seen some tanks. 
Appellant stated that they were not going to steal any tanks and that
the police arrested them.  Appellant
testified that he had two Igloo coolers in the back of his pickup that smelled
like ammonia but did not contain any ammonia. 
The coolers had contained liquid anhydrous ammonia but were empty when
appellant and Wristen were arrested. 
Appellant had used the anhydrous ammonia in connection with
manufacturing methamphetamine.  At the
time of the arrest, appellant had other items in the back of his pickup that he
used in connection with manufacturing methamphetamine.  Appellant testified that, after they were
arrested, Wristen denied any involvement. 
Wristen signed a statement that it was appellant=s idea to go to Baird and that appellant had
gotten him arrested.            

As a
result of his arrest, appellant=s employer required him to take a drug test.  He failed the test, and his employer terminated him in February
2001. 

Appellant
testified that he never intended for Wristen to be killed.  He thought that Ellis and AJimmy@ were working a scheme to get money, drugs, and a gun from him.  On a previous occasion, appellant had hired
a man named ATattoo@ to beat up Wristen.  Ellis had
introduced appellant to Tattoo.  The
three of them met in a motel room. 
Tattoo agreed to do an Aass whupping@
of  Wristen for half a gram of
dope.  Appellant gave the dope to
Tattoo; however, Tattoo never did anything to Wristen. 

Appellant
received a number of calls from Ellis from the Runnels County Jail before he
received the call about AJimmy.@ 
Appellant=s understanding was that Ellis was in jail
for theft of an anhydrous ammonia tank and parole violations.  In the earlier calls, Ellis asked appellant
to bail him out of jail, but appellant did not have the money to bail him out. 

Appellant
testified about the recorded phone call that he received from Ellis from the
Runnels County Jail.  Ellis stated that
he was about to get out of jail. 
Appellant did not think that there was any way that Ellis could get out
of jail because of the parole violations. 
During the call, Ellis told him that he had someone who could handle the
problem with Wristen.  Appellant said
that A[he] need[ed] it took care of.@ 
Appellant testified that he meant that Wristen still needed his Aass whupped.@  Appellant testified that he
thought Wristen was talking about his drug manufacturing. Ellis told appellant
that appellant needed to meet AJimmy.@ 

Appellant
testified that he talked with AJimmy@ on the phone.  They discussed the Aheater@ and the ACorky problem@
during the call.  At that time,
appellant thought that Ellis was up to something. 








Appellant
testified that he did not believe that the situation involving AJimmy@ was real.  He did not believe
that AJimmy@ was a real contract killer.  He
stated that 10 grams of dope had a street value of about $1,000 and that he Awouldn=t think getting anybody killed for a thousand dollars would even be
considerable.@ 
Rather, he thought that Ellis was trying to get the dope and a gun out
of him and that nothing would happen to Wristen.  Appellant also thought that he would be busted for drugs and that
Ait would all be over with.@  

Appellant
felt like he needed to go to the motel room to meet AJimmy@ to see where everything was going. 
He wanted to know whether he had been turned in for manufacturing drugs.
He was on the videotape that was shown to the jury.  Appellant brought the gun without a clip but did not know that
the gun could be fired one time without a clip.  He had never fired the gun and did not know whether it would
work.  Appellant thought that AJimmy@ wanted the gun for a scare tactic. 
Appellant delivered the drugs to AJimmy@ in several individual gram bags.  He testified that he did not deliver good
speed.  Appellant testified that the
speed he delivered to Agent Woods was a mixture that contained less than half a
gram of methamphetamine.  

Appellant
testified that, at their meeting on March 12, AJimmy@ asked him if he wanted Wristen dead.  Appellant responded AHell yeah@ because he wanted to get out of the room.  However, the tape showed appellant and AJimmy@ engaging in additional conversation after appellant responded to this
question. 

Finally,
appellant called Dana Gore, the records custodian at the Runnels County Jail,
as a witness.  She testified that Ellis
got out of the Runnels County Jail on March 9, 2001. 








We find
that the evidence was factually sufficient to support the jury=s conviction of appellant for solicitation of
capital murder.  The tape recordings of
the phone calls and the videotape of appellant=s meeting with Agent Woods established that appellant provided Agent
Woods with details about Wristen; that appellant delivered the Aheater@ to Agent Woods; and that appellant delivered the A10@ grams of methamphetamine to Agent Woods.  Appellant responded to Agent Woods=s question that appellant wanted Wristen dead with AHell yeah.@  Appellant did not testify that
he misunderstood anything that Agent Woods said during their discussions.  The evidence supporting guilt was neither so
weak as to render the conviction clearly wrong and manifestly unjust nor so
greatly outweighed by the overwhelming weight of contrary evidence as to render
the conviction clearly wrong and manifestly unjust.  

Appellant=s factual insufficiency point is based on his
own testimony that he did not think the situation was real and that he did not
intend for AJimmy@ to kill Wristen.  The jury was
the exclusive judge of the credibility of the witnesses and the weight to be
given their testimony.  TEX. CODE CRIM.
PRO. ANN. arts. 36.13 & 38.04 (Vernon 1979 & 1981); Wesbrook v. State,
29 S.W.3d 103 (Tex.Cr.App.2000), cert. den=d, 532 U.S. 944 (2001).  The jury
found that appellant=s
testimony was not credible.  Appellant=s third point of error is overruled.

In his
first two points, appellant asserts that the trial court erred in excluding the
testimony of his expert witness Dr. Mark Cunningham (a psychologist) during the
guilt/innocence phase of the trial. 
After the trial court excluded the testimony, appellant presented the
testimony in a bill of exception.  We
review a trial court=s
evidentiary rulings under an abuse of discretion standard.  Guzman v. State, 955 S.W.2d 85, 89
(Tex.Cr.App.1997).  

Appellant
asserts in his first point that the testimony of Dr. Cunningham was admissible
as to appellant=s entrapment defense.  In his brief, appellant states that he
proffered Dr. Cunningham=s testimony to establish Athe mental effects of methamphetamine abuse and how human behavior and
mental processes are affected by the drug.@  Appellant also sought to
establish his Amental processes@ that were revealed by tests performed by Dr.
Cunningham.  Appellant also wanted to
show that his state of mind was weakened and vulnerable to entrapment because
of methamphetamine toxicity and methamphetamine psychosis. 








During his
testimony, appellant denied that he committed the offense of solicitation of
capital murder.  He maintained that he
lacked the criminal intent to commit the offense.  He testified that he did not intend for AJimmy@ to kill Wristen.  An entrapment
defense is not available to a defendant who denied that he committed the
offense during his testimony.  Melton v.
State, 713 S.W.2d 107, 112 (Tex.Cr.App.1986); Warren v. State, 565 S.W.2d 931,
933 (Tex.Cr.App.1978); Stephens v. State, 522 S.W.2d 924, 926 (Tex.Cr.App.1975);
Williams v. State, 848 S.W.2d 777, 781 (Tex.App. B Houston [14th Dist.] 1993, no writ). 
An entrapment defense is neither available to a defendant who claims a
lack of criminal intent.  Zamora v.
State, 508 S.W.2d 819, 822 (Tex.Cr.App.1974); Smith v. State, 733 S.W.2d 604,
604-05 (Tex.App. B
Dallas 1987), vacated  on other
grounds, 761 S.W.2d 17 (Tex.Cr.App.1988). 
Thus, appellant=s
testimony negated an entrapment defense. Therefore, the trial court did not
abuse its discretion in excluding Dr. Cunningham=s testimony to the extent appellant offered it in an attempt to
establish an entrapment defense. 
Appellant=s first point is overruled.

In his
second point, appellant asserts that Dr. Cunningham=s testimony was admissible to assist the jury
in considering whether appellant intended to commit the offense.  Appellant testified that, based upon his
perception of the facts, he did not believe that the situation was real.  In his brief, appellant asserts that:

Dr. Cunningham=s testimony concerning the effects of methamphetamine on a person=s thought processes and the drug=s destabilizing effect on a person=s ability to properly sequence information or
events to reach a logical conclusion would have assisted the jury in
determining whether the Appellant in fact intended to solicit Capital Murder or
whether the Appellant believed the situation was being created by Michael Ellis
to obtain drugs and a gun from Appellant. 

 

Appellant acknowledges
the general rule in Texas that evidence of diminished mental capacity is not
admissible at the guilt/innocence phase of the trial on the issue of
intent.  See Warner v. State, 944 S.W.2d
812 (Tex.App. B Austin 1997), pet=n dism=d, 969 S.W.2d 1 (Tex.Cr.App.1998). 
Appellant asserts that the testimony was not offered to show diminished
capacity.  However, the essence of the
offered testimony was (1) that chronic methamphetamine use diminishes the user=s mental capacity and (2) that, because of
the diminished capacity, the chronic user could perceive the facts in the
manner that appellant claims to have perceived them.  Thus, appellant did, in fact, attempt to present a diminished
capacity defense.  As such, the
testimony was not admissible on the intent issue.  The trial court did not abuse its discretion in excluding Dr.
Cunningham=s testimony during the guilt/innocence phase
of the trial.  Appellant=s second point is overruled.

                                                        Cause
No. 11-02-00086-CR








In his
second point, appellant asserts that the trial court erred in admitting the
methamphetamine into evidence because the State failed to establish a chain of
custody of the methamphetamine.  The
evidence set forth above establishes the chain of custody.  Agent Woods testified that appellant delivered
to him two large bags each containing five smaller individual Ziplock bags full
of the substance.   Agent Woods put the
bags into his pocket.  After he got back
to his office, he booked the drugs into the crime task force=s evidence vault.  On April 11, 2001, Agent Woods retrieved the drugs and took them
to the D.P.S. lab for testing.  The
laboratory technician, Swim, received the evidence from Agent Woods, assigned
the evidence the unique case number L4A-38791, placed the evidence in an
envelope, and wrote the case number on the envelope.  The evidence remained in the D.P.S. evidence vault until Officer
Dickie took the evidence out of the vault and opened the envelope for testing
the evidence.  Officer Dickie testified
that he performed a spot test on the substances in each of the ten bags before
he combined the substances.  After
completing the testing, Officer Dickie sealed the methamphetamine in one of the
two larger bags that Agent Woods had submitted.  Officer Dickie placed the two larger bags in an outside envelope
and placed the evidence in the D.P.S. evidence vault.  Agent Woods retrieved the evidence on November 12, 2001, and
booked it into the evidence vault at the task force, where the evidence
remained until Agent Woods brought it with him to the trial.  The evidence was not opened until Agent
Woods testified at the trial.  The
testimony of Agent Woods and Officer Dickie proved the chain of custody.  The trial court did not err in admitting the
methamphetamine into evidence. 
Appellant=s second point is overruled.








In his
first point, appellant asserts that the evidence was factually insufficient to
support his conviction for the offense of delivery of methamphetamine in an
amount of 4 grams or more but less than 200 grams.  Appellant asserts that Officer Dickie commingled the powder from
the 10 bags before determining whether each of the bags contained
methamphetamine.  Appellant states that
Officer Dickie should have performed a gas chromatograph mass spectroscopy test
on the contents of each of the bags before commingling the contents.  However, Officer Dickie testified that he
performed spot tests on the contents of each of the 10 individual bags before
combining the contents from them.  The
spot tests showed that each of the bags contained the same substance.  Therefore, Officer Dickie combined the contents
and determined the aggregate weight of the contents to be 9.6 grams.  Officer Dickie then performed the gas
chromatograph mass spectroscopy test. 
Officer Dickie testified that the test established that the brown
powdery substance contained methamphetamine. 
Moreover, appellant testified that he delivered 9 or 10 grams of a
mixture containing methamphetamine to Agent Woods.

By
statute, a A[c]ontrolled substance@ is defined as a Asubstance, including a drug, adulterant, and
a dilutant@ and A[t]he term [controlled substance] includes the aggregate weight of any
mixture, solution, or other substance containing a controlled substance.@  TEX.
HEALTH & SAFETY CODE ANN. ' 481.002(5) (Vernon Pamph. Supp. 2003).  Methamphetamine is a controlled substance.  TEX. HEALTH & SAFETY CODE ANN. ' 481.102(6) (Vernon Pamph. Supp. 2003).  Officer Dickie testified that the powdery
substance was a mixture containing methamphetamine with an aggregate weight of
9.6 grams.  The evidence supporting
guilt was neither so weak as to render the conviction clearly wrong and
manifestly unjust nor so greatly outweighed by the overwhelming weight of
contrary evidence as to render the conviction clearly wrong and manifestly
unjust.  Thus, the evidence was
factually sufficient to support the jury=s verdict.  Vasquez v. State,
supra at 236; Goodman v. State, supra; Johnson v. State, supra at 11; Cain v.
State, supra; Clewis v. State, supra. 
Appellant=s first point  is overruled.

                                                                This
Court=s Ruling

The
judgments of the trial court are affirmed.

 

PER
CURIAM

 

May 8, 2003

Do not publish.  See TEX.R.APP.P. 47.2(b).

Panel consists of: Arnot, C.J., and

Wright, J., and McCall, J.











     [1]TEX. PENAL CODE ANN. '' 15.03(a), 19.02(b)(1), & 19.03(a)(3) (Vernon 2003).  





     [2]TEX. HEALTH & SAFETY CODE ANN. ' 481.112(d) (Vernon Pamph. Supp. 2003).