Aaron Lee MALONE, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–92–302 CR.

Court of Appeals of Texas,
Beaumont.

Submitted Jan. 13, 1994.

Decided Sept. 7, 1994.

---

Douglas M. Barlow, Beaumont, for appellant.

Tom Maness, Dist. Atty., John R. Dewitt, Asst. Dist. Atty., Beaumont, for State.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Justice.

The appellant, Aaron Lee Malone, appeals from the jury conviction for the felony offense of murder. The jury assessed punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice for a term of 50 years, together with a fine of $10,000.

The appellant has alleged three points of error, which read as follows:

POINT OF ERROR NO. ONE: The trial court erred in admitting State's Exhibit No. 5, a confession, obtained as a result of the unlawful arrest of appellant.

POINT OF ERROR NO. TWO: Reversible error occurred when the prosecutor elicited testimony regarding appellant's post-arrest silence.

POINT OF ERROR NO. THREE: Reversible error occurred when the prosecutor was allowed to interject his personal opinion before the jury.

Before addressing these points of error, we will give a brief, factual history of the case.

### Background

On the night of October 5, 1991, the appellant, another individual Darrell Hughes, and the victim Charles Sides were seen by Officer Norman Rushing, who was on duty at that time. At approximately 8:00 p.m. that same evening, Officer Rushing saw the victim, Charles Sides, who seemed to him to be very intoxicated due to the fact that when asked to stand up Mr. Sides could not do so. It was the intention of the officer to place Mr. Sides under arrest for the offense of public intoxication; however, the officer was interrupted by the appearance of the appellant and Darrell Hughes, who offered to take care of Mr. Sides. The officer felt at that time that they were responsible citizens due to the fact that they were dressed in military, camouflage fatigues and wore combat boots. He believed that they were ex-military or military personnel coming from Desert Storm.

At approximately 9:00 p.m. that same evening, Darrell Hughes and the appellant went to the home of Susan Elizabeth Clanan, where she resided with her husband Scott and her baby Allison. Appellant was temporarily staying at this home. Appellant and Darrell Hughes were both drunk. Upon their arrival at the Clanan home, Hughes revealed to Mrs. Clanan that he had just murdered a man. Mrs. Clanan did not believe the story. In trying to convince her of this murder, Hughes asked the appellant to show her the knife that was used in the

killing of Charles Sides. In addition to the knife, Hughes reached into his right pants pocket and pulled out the ear of the victim, exhibiting the human ear. The human ear was flushed down the toilet later. Still in disbelief, Mrs. Clanan begin to notice that Hughes was covered with blood from his knee down. It was alleged that the appellant and Darrell Hughes were members of the Neo–Nazi group called the "Skinheads".[1]

At the Clanan home, the appellant and Hughes left Hughes' bloody pants and a bloody sock. The police recovered these items from the Clanan home and brought them to the police station. It is important to note that Hughes had carved a swastika into his arm with a razor. The appellant and Hughes were invited to the police station for questioning. They agreed. No arrest was made. After a phone call of confidential informant information, the appellant and Hughes were placed under arrest. The State based the arrest on the good faith belief that two and particularly, the appellant would attempt to flee. From the conversations at the Clanans' house and the information from the reliable informant, probable cause existed.

### First Point of Error

In appellant's first point of error, he asserts that the trial court erred in admitting State's Exhibit No. 5, a confession, obtained as a result of the arrest of appellant. The appellant argues in his brief that, but for his arrest the State never would have obtained a confession which was admitted at trial and which he argues contributed to his conviction.

▓▓ To determine whether the confession was a result of an illegal detention, thus causing such confession to be tainted, the trial court conducted a pretrial hearing as required by *Jackson v. Denno*.[2] At this hearing the trial court's duty was to determine whether or not the confession was given voluntarily and if so, to determine its admissibility. In such a pretrial hearing, the trial court is bound by a duty to find beyond a reasonable doubt that the confession was obtained legally and was given freely and voluntarily. The trial court so found. The trial court found, in the case at bar, that the arrest of the appellant was based on probable cause and that the appellant was taken before a magistrate before giving his confession, thereby purging any taint of illegality of the arrest. The trial court also found that at no time prior to the appellant signing the confession did he ever request the presence of an attorney or in any manner invoke his right to an attorney.

The trial court denied the appellant's motion to suppress the evidence and admitted the confession before the jury.

▓▓ It is the duty of this Court to review the facts and evidence as they were presented to the court and to reverse the trial court if there was an abuse of discretion. We find none. We have examined the record.

After reviewing and endeavoring to correctly analyze the transcription of the reporter's notes of the hearing on the defendant's motion to suppress, we conclude it is a balanced and correct statement to say that Malone was invited and agreed to go to the police station at about noontime on a certain day. Malone was not under arrest. Malone arrived at the Port Arthur Police Station at about noon or maybe shortly before noon. At about 1:00 p.m., or about an hour later, one of the detectives received an important telephone call and had a communication with a confidential, reliable informant. The informant had initiated the call to the police station and had advised the detective of what probably happened in connection with the homicide of Sides. At about 1:00 p.m., the detectives had obtained some detailed information about what had happened at the homicide.

---

1. It was the philosophy of this group to kill anyone that was not of the white race such as Blacks, Jews, or a person down on their luck or downtrodden, bums or fags, in order to be awarded gold shoe laces. The severance of a human ear signified such a killing of an alleged bum or drunk. Gold shoe laces worn on the member's boots were a sign of honor and prestige.

2. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

The record reflects that from about noon or 1:00 p.m. until about 3:30 p.m., Robertson and another detective questioned Darrell Hughes and Malone. From the record and the findings below, it is concluded that this questioning was not custodial. No arrest had been effected. At about 3:30 p.m. the detectives advised in a pronounced and formal way that Malone was under arrest.

Then about 6:30 p.m., Malone was taken to the Justice of the Peace, Dorman, and given the *Miranda*[3] warnings by that judge at that time. The statement involved, being an inculpatory confession, was timed at 7:00 p.m. Noteworthy and significant is the statement of Malone that he did not ask for or request an attorney while he was before Dorman. The record clearly proves that Dorman gave all the *Miranda* warnings to Malone.

Critically the record reflects, according to detective Robertson, that after Malone was placed under arrest, Malone did not say that he did not want to talk to the detective, nor at any time did he request an attorney nor at any time did Malone request to talk to anyone else. The detective said that Malone was not promised anything, either before or after the arrest and that Malone was not threatened. Furthermore, the detective said that Malone was not coerced or tricked in any way.

Further, when Malone began to talk about his involvement in the episode, Malone's statements were completely voluntary on his part and he did not appear to be intoxicated or under the influence of any drugs. However, once Malone gave his oral narration, he was speedily taken before the justice of the peace, a magistrate. The justice of the peace was Dorman. She read him his rights and properly warned him concerning his rights and a bond was set. That proceeding was completed before making any kind of written confession.

During the interim Malone was given something to eat, mainly hamburgers. At about 7:00 p.m. the statement was completed. For the purposes of the motion to suppress the statement was identified as State's Exhibit No. 5. Critically, the initials "A.M." (which were Aaron Malone's initials) were placed in each category as to each *Miranda* warning.

Included in the "voluntary statement" (State's Exhibit 5) the five Miranda warnings and admonitions were each initialed by "A.M.". At the beginning of the paragraph after (5), there were placed by Malone the initials of Aaron Malone to the effect that prior to and during the making of this statement:

> I have and do hereby knowingly and intelligently waive the above explained rights, and I do make the following voluntary statement to the aforementioned person of my own free will without any promises or offers of leniency or favors and without compulsion or persuasion of any person or persons whomsoever.

The *Miranda* rights were read aloud in the English language to Malone who appeared to understand the *Miranda* warnings. Paragraph (3) reads: "That I have the right to have a lawyer present to advise me prior to and during any questioning."

The record reflects that Malone read the rights and appeared to understand them. This was done before the initialling. Malone also admitted that he had not asked Justice of the Peace Dorman for the benefits of any of the *Miranda* rights and he did not ask to have an attorney while before the justice of the peace. We hold the confession admissible.

According to the detective, from the beginning until the end of the taking of the statement and until Malone signed the statement, Malone did not ask to talk to an attorney, nor did he state that he did not want to talk to the detective any further. The detective reaffirmed that no promises of any kind were made, nor any threats of any kind were made.

Robertson did state that after the detectives received some of the information about the elements of the episode that they would probably not have permitted Malone or Hughes to leave. But this situation never arose.

**3.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■ Under the statement of facts on the motion to suppress, we think that correct consent was given to come into the Clanans' house and we conclude from the circumstances that the murder was in plain view and that the pants with the blood were in open visibility. We deem this established probable cause to request that Malone and Hughes accompany the officers to the police department for initial investigative purposes.

■ The ultimate inquiry seems to be whether there is an actual restraint on freedom of movement of the degree that is associated with a formal, announced arrest. *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). Usually, reviewing courts will look to at least four elements or factors in answering this important inquiry and in analyzing the evidence relevant thereto. The factors are: (1) whether probable cause existed to arrest the individual, (2) whether the investigation had focused upon the individual, (3) the subjective intent of the law enforcement officers, and (4) the subjective belief of the individual. *Wicker v. State*, 740 S.W.2d 779 (Tex.Crim.App.1987).

■ During the early part of the general investigation, the investigation had not zeroed in on or focused upon Malone and his subjective belief from surrounding circumstances was that he was not under arrest. This approach to these matters requires that each case be examined on its own facts. *Ancira v. State*, 516 S.W.2d 924 (Tex.Crim.App.1974). The totality of all the circumstances must be considered and weighed. *LaPoint v. State*, 650 S.W.2d 821 (Tex.Crim.App.1983). Pertinent thereto and relative to the ultimate inquiry is the doctrine that a temporary detention for investigatory purposes does not constitute custody. *See Wallace v. State*, 813 S.W.2d 748 (Tex.App.—Houston [1st Dist.] 1991, no writ).

■ Clearly, a voluntary accompanying of an officer by an individual to discuss a fresh non-focused investigation is not custodial. It is Hornbook law that the trial judge could have discounted the accused's version on the motion to suppress.

It is certainly correct that Mr. Malone's testimony contradicted the detective's testimony in a number of respects. But, those issues were to be decided by the district judge. He had the right and prerogative to disbelieve all or parts of Mr. Malone's testimony, as we understand the law under *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). We conclude that the confession or voluntary statement was not the fruit of an unlawful, warrantless arrest.

The trial court entered specific findings of fact and conclusions of law concerning the confession. The trial court found beyond a reasonable doubt that concerning the confession the following factors and facts were true: (1) that prior to making the confession the defendant was fully warned of his rights as required by *Miranda v. Arizona, supra,* of the TEX.CODE CRIM.PROC.; (2) that the defendant did then knowingly waive his right to an attorney and did then freely and voluntarily without being induced by any compulsion, threat, promises, or persuasions made and signed a confession in writing; (3) that the defendant voluntarily went to the police station and that while at the police station an officer received outside information from a credible witness which gave rise to a probable cause to arrest the defendant after receiving the outside information; and (4) that prior to giving his confession or written statement the defendant was taken before a magistrate and properly warned of his rights thereby purging any taint of any illegality of the arrest and making the confession admissible, *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) and finally, that the trial court found that at no time prior to the signing of the confession did the defendant request an attorney or in any other manner invoke his right to an attorney or to counsel. In a concluding paragraph the trial court found that the confession was freely and voluntarily made without any compulsion or persuasion and that it is admissible on the trial of the case on its merits.

■ The trial judge observed the witnesses, Robertson and appellant, at the hearing on the motion to suppress and we conclude ultimately that the statement of facts relative thereto sustain the trial court's ac-

tions and findings. There is no error. It must be remembered that there must be a nexus or a causal connection and relationship between any of the alleged complained of activity and the statement or confession itself. *Barber v. State*, 737 S.W.2d 824 (Tex. Crim.App.1987). We opine that the trial judge considered the giving of the *Miranda* warnings, the appearance before the justice of the peace, the time proximity of between the arrest the appearance before Justice of the Peace Dorman, and the making of the statement, to validate and make admissible the confession. We overrule point of error number one.

### Point of Error Two

In appellant's point of error number two, the appellant urges that reversible error occurred when the prosecutor elicited testimony regarding the appellant's post-arrest silence. The particular situation that is urged by the appellant is in the following litany:

Q [The Prosecutor] So Judge Dorman explained to you what you were charged with. Is that correct?

A [Appellant] Yes.

Q And that you had a right to have a lawyer?

A Yes.

Q And did she tell you that at any time you could quit talking to the police if you wanted to quit talking to them?

A Yes.

Q And that you have a right to remain silent. Did she tell you that?

A Yes.

Q And that you're not required to make any statement if you don't want. Did Judge Dorman tell you that?

A Yes.

Q Did you tell Judge Dorman that you didn't do it?

A She didn't ask me.

Q Oh, okay. You know, it just would seem to me that if I had been charged with one of the most brutal murders—

[Defense Counsel]: Your Honor, we object to this argument about it seems to the District Attorney, and asks that

he not be allowed to make his jury argument yet.

THE COURT: Sustain the objection to his personal comments.

[Defense Counsel]: And ask that the jury be instructed to disregard it.

THE COURT: The jury will disregard the personal comments of District Attorney.

Q If in fact you had been charged with a brutal murder, how come you didn't say, Judge, I didn't do it. Let me tell you what happened. Let me tell somebody. There's been a mistake. How come you didn't do that?

A I told the detectives that and they didn't listen, and they went and had a conversation with the judge. I'm sure she wouldn't have listened either.

 The objection raised by defense counsel and the sustaining of that objection by the trial court and the further admonishment by the trial court to the jury to disregard certainly cleared any impropriety that was made by the statement of the State. And because of the curing effect of the court's admonishment, we overrule the appellant's point of error number two.

### Jury Argument

 In appellant's point of error number three, the appellant asserts that reversible error occurred when the prosecutor was allowed to interject his personal opinion before the jury. It is permissible to allow the prosecutor to argue and orate within any one of four areas. Those proper areas of jury argument include: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement. *Kinnamon v. State*, 791 S.W.2d 84 (Tex.Crim.App. 1990).

 If the accusatory statement made by the prosecutor falls within one of the four proper areas of jury argument (such as, a reasonable deduction from the evidence) then it is permissible. The statement made by the prosecutor was only in response to an allegation or a statement made by the appellant on cross-examination when the State

asked him about certain witnesses and the appellant referred to those witnesses and their statements in particular as being lies.

In order for this Court to hold such a statement or argument as made by the State's attorney as being error or reversible error; we must find harm or prejudice. In the case at bar, we find none. TEX.R.APP.P. 81(b)(2) is satisfied. We find only that the statement made by the prosecutor was in response to a statement made by the appellant on cross-examination. We find that the statement was within one of the four permissible areas of jury argument, therefore, we overrule point of error number three. We overrule all the appellant's points of error. We affirm the judgment.

**AFFIRMED.**

BURGESS, Justice, dissenting.

I dissent. Appellant's first point of error focuses on his confession being tainted because of an illegal arrest, not the voluntariness of the confession or any right to counsel allegations.

The majority notes the detectives received information from a confidential informant shortly after 1:00 p.m. and Malone was placed under arrest by the detectives at about 3:30 p.m. It is uncontroverted it was a *warrantless* arrest. Consequently, the arrest had to be authorized under chapter 14 of the Code of Criminal Procedure. Since the trial court found: "the officer received outside information from a credible witness which gave rise to probable cause to arrest the Defendant at that time", article 14.04 which authorizes a warrantless arrest "where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape" has to be the authorization relied upon by the state and the court. The statute requires satisfactory proof that (1) a felony has been committed, (2) the person arrested is the offender and (3) the offender is about to escape so there is not time to procure a warrant. *DeJarnette v. State*, 732 S.W.2d 346, 349 (Tex.Crim.App.1987). Unfortunately, the court did not make separate findings as to probable cause that Malone had committed a felony and that Malone was about to escape.

There is simply no evidence as to why the detectives did not prepare a probable cause affidavit and seek an arrest warrant. Apparently the trial court thought the legality of the arrest was an issue because the trial court also found "[p]rior to giving his confession and subsequent to the arrest, the Defendant was taken before a Magistrate and properly warned of his rights thereby purging any taint of any illegality of the arrest and making the confession admissible. *Brown v. Illinois*, 422 U.S. 590 [95 S.Ct. 2254, 45 L.Ed.2d 416]." Thus the trial court presents the real question: was taking Malone before the Justice of Peace enough of an intervening circumstance to attenuate the taint? I think not.

*Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), is the case most often referred to as establishing the "fruits of the poisonous tree" doctrine wherein evidence obtained as the result of an illegal search or an illegal arrest must be suppressed unless there has been sufficient attenuation of the taint. *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), followed *Wong Sun* and held that the giving of Miranda warnings does not resolve the issue of attenuation of taint of an illegal arrest, but is a factor along with the temporal proximity of the arrest and the confession, the presence of intervening circumstances and, particularly the purpose and flagrancy of the official misconduct.

*Taylor v. Alabama*, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982), held that giving of the Miranda warnings three times did not cure the illegality of the arrest. Six hours elapsed between the arrest and the confession; no significant event occurred. But in *Johnson v. Louisiana*, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), the court reviewed the use of a line-up, after an illegal arrest. The court noted the defendant was represented by counsel at the line-up and prior to the line-up he had been brought before

a committing magistrate to advise him of his rights and set bail. At the time of the

lineup the detention of the appellant was under the authority of this commitment. Consequently, the lineup was conducted not by 'exploitation' of the challenged arrest but 'by means sufficiently distinguishable to be purged of the primary taint'.

While the *Johnson* opinion is unclear as to the actions taken by the magistrate, it seems to indicate the "committing magistrate" made some determination of probable cause and issued some type of "commitment". Here it is clear the Justice of the Peace did nothing more than read Malone his rights in accordance with TEX.CODE CRIM.PROC.ANN. art. 15.17 (Vernon Supp.1994) and set bail. The form notes an affidavit *has not* been filed with the court. It further notes the accused should be unconditionally released unless a criminal charge and compliant is filed within approximately 48 hours. Clearly this appearance before the magistrate was nothing more than the Miranda warnings by a different person and not a "commitment" as envisioned in *Johnson.*

There is no evidence to show why the officers did not prepare a probable cause affidavit between the time of the arrest and taking Malone to the Justice of the Peace. This alone took three hours; five and one-half hours since receiving the confidential information. October 7, 1991 was Monday, a work day. The Justice of the Peace office was across the street from the Port Arthur police station. There is no evidence of unavailability of secretarial support, unavailability of assistant district attorneys or unavailability of the magistrate. It is inconceivable that Detective Robertson with 14–years' experience as a detective and 21–years' experience in law enforcement was untrained in the area of "arrest law". This total disregard for compliance with law shows the police misconduct is flagrant.

I would sustain Malone's point of error and reverse and remand for a new trial.